[No. H032390. Sixth Dist. Feb. 26, 2009.]

In re the Marriage of JACK and CINDIE ALTER.
JACK MITCHELL ALTER, Appellant, v.
CINDIE GREENBAUM ALTER, Appellant.

**COUNSEL**

Law Offices of Bernard N. Wolf, Bernard N. Wolf and Nicholas P. Barthel for Appellant Cindie Greenbaum Alter.

Wendy Morgan and Garrett C. Dailey for Appellant Jack Mitchell Alter.

**OPINION**

**PREMO, J.**—This is an appeal and cross-appeal from the trial court's postjudgment order reducing child and spousal support. In her appeal, respondent Cindie Greenbaum Alter argues that the trial court erred by refusing to enforce the parties' marital settlement agreement (MSA), which stated that child support was to be "absolutely non-modifiable downward." In his cross-appeal, petitioner Jack Mitchell Alter argues that the trial court abused its discretion by considering as income the $6,000 his mother gave him every month. We reject both arguments. The trial court always has the power to modify an existing child support order, either upward or downward, notwithstanding the parties' agreement to the contrary. And, where a party receives recurring gifts of money, the trial court has discretion to consider

that money as income for purposes of the statewide uniform child support guidelines. (Fam. Code, § 4050 et seq.)[1]

We do agree with Jack[2] that the trial court misread the MSA in setting the amount of spousal support. Accordingly, we shall reverse the judgment and remand the matter for the trial court to reconsider that portion of its order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Introduction*

Jack and Cindie were married in 1989. They had two minor children, Samantha and Alexandra. When Jack and Cindie separated in 2001 they entered into an MSA, which was ultimately incorporated into the judgment of dissolution. The MSA gave Cindie sole physical and legal custody of the children and required Jack to pay child support of $4,000 per month plus significant additional child support in the form of tuition payments and the like, which are commonly known as "add-ons." (§ 4062; *In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1039 [31 Cal.Rptr.2d 749].) Paragraph No. 4.9 of the MSA stated: "These obligations shall be absolutely non-modifiable downward throughout the term that child support shall remain in effect."

The MSA also required Jack to pay spousal support of $3,000 per month, to give Cindie a portion of anything he inherited from his mother or from his father's estate, and to maintain an estate plan that left 25 percent of his own estate to Cindie. Spousal support would not terminate upon Cindie's remarriage, but it could be reduced to $1,000 in specified circumstances.

Immediately after finalizing the MSA in July 2001, Cindie moved with the children to Georgia, where they continue to reside.

### B. *The Current Litigation*

On December 7, 2004, Jack commenced proceedings to modify his support obligations based upon changed circumstances. Jack sought a reduction in child support to the amount required under the statutory guidelines, reduction of his responsibility for the add-ons, and elimination of spousal support. Cindie opposed the modifications, arguing that under the terms of the MSA

---

[1] Further unspecified section references are to the Family Code.

[2] Consistent with the tradition in marital dissolution cases, we refer to the parties by their given names for the sake of clarity and mean no disrespect in doing so. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1 [97 Cal.Rptr.2d 707].)

the child support provisions could not be reduced and, in any event, there had been no change in circumstances. The issues were litigated for over two years, finally going to trial in June 2007.

### 1. *Jack's Income*

Jack testified that he had worked in his family's retail drapery business most of his life. He had inherited the business on the death of his father in 1996 and continued to operate it, with varying degrees of success, through the time of trial, when his income from the business was about $7,000 per month. When Jack and Cindie separated in 2001, Jack had anticipated receiving additional income of around $12,500 per month from a commercial building his mother owned. That income never materialized, however, because Jack's mother sold the building. Thus, according to Jack, his income was not what he had expected it to be when he and Cindie entered into the MSA and was now insufficient to meet all his obligations under the judgment.

Jack admitted that his mother covered many of his expenses. She had been regularly giving him $3,000 per month for many years. For a time after the divorce, Jack lived with her, rent free. In 2005, she purchased a house in Sunnyvale and Jack moved into it. She then increased Jack's monthly stipend to $6,000, $3,000 of which Jack used to pay the rent his mother charged. Jack's mother also paid for Jack's daughters' schools, tutoring, and summer camp. Jack used his mother's credit card to buy clothes and other things for the girls. His mother paid for transportation and lodging for Jack to visit his daughters in Georgia several times a year. She gave him money from time to time when he needed it. She paid his attorneys in California and in Georgia. And, although Jack had declined the offer, his mother had also volunteered to pay the difference between the court-ordered support and that which Jack was able to pay himself.

Jack claimed that all the money his mother had given him over the last several years had been loaned. He produced a number of promissory notes dating back to 2005, documenting the debt. The notes were not itemized and did not call for interest. The total of the notes showed that Jack owed $400,000 to his mother's trust and $25,000 to his brother. Although the notes had different dates, the notes Jack produced at trial were all signed on the same day. Jack explained that his mother's attorney sent him the notes via e-mail, he printed them, signed them, and sent them back to the attorney. The notes he produced were those he still had on his computer, which he printed and signed all at once. Jack testified that the loans would not be repaid out of his inheritance because his mother's money was to remain in a trust.

Jack explained that his mother began asking for repayment when she learned of the terms of the MSA. Jack had not wanted to tell his mother about some of the terms of that agreement, particularly the inheritance clause. But as it got harder and harder for him to make the payments required by the judgment, he felt compelled to disclose the entire agreement to his mother who, thereafter, demanded he sign promissory notes for the money that went to support Cindie. According to Jack, the loans would not continue. Cindie countered that, when Jack's father died, Jack's mother began giving Cindie and Jack $4,000 per month on a regular basis and it was with that source of money that Jack had planned to pay some of the support required by the judgment. Cindie always understood this money to have been a gift, not a loan. Jack's mother did not testify.

## 2. *Cindie's Income*

Cindie was a lawyer, although she had not been employed outside the home during the marriage. After she returned to Georgia in 2001, she reactivated her license to practice law and obtained a job as a clerk for a superior court judge. Her annual salary had risen from $19,500 in 2005 to nearly $61,000 in 2007. She had some dividend income, as well. Her 2005 tax return showed dividends of $10,319 for the year, most of which, Cindie explained, came from accounts she owned in joint tenancy with her father. Cindie received annual notice of dividends from these accounts but she never actually received the dividends and did not have access to the accounts. She did not submit tax returns for 2006. By the time of trial Cindie had liquidated most of her own savings to pay for this litigation and a lawsuit she had commenced against the builder of her house in Georgia. Her income and expense declaration for 2007 showed monthly dividends of $50 and noted that any other dividends she reported on her tax return were "paper income" only.

## 3. *The Trial Court's Orders*

The trial court made three orders: the July 2, 2007 order, the July 9, 2007 amended order (first amended order), and the final order of October 29, 2007 (second amended order).

The trial court's first order rejected Cindie's claim that child support could not be reduced, concluding that "the court always has jurisdiction to modify [child support]." The court found that since Jack was not receiving the $12,500 per month he had anticipated in 2001, there had been a material change in Jack's financial situation. The court found that Jack's monthly

income from his business was $7,500 and that he "historically and continually receives $6,000 per month from his mother and another $1,000 in cash and benefits . . . , totaling $7,000 in non-taxable income per month." The court found Cindie's salary to be as stated on her wage and tax statements and that her dividends were $10,319 for all of 2005, $480 per month for 2006, and $100 per month for 2007. Applying its findings to the statutory formula, the court determined that Jack's monthly child support payments should be reduced. The court did not modify the add-ons.

In the first amended order, the court confirmed the findings contained in the original order, made the additional finding that, "Both sides signed a Marital Settlement Agreement which set a floor for support," and reduced the spousal support payment to $1,000. Jack filed written objections to the calculation of Cindie's income, the characterization of the $6,000 per month he received from his mother as income, and the finding that the MSA set a floor of $1,000 per month for spousal support.

The second amended order confirmed most of the findings in the prior orders and corrected an error in the calculation of one of the child support payments. The final orders reduced child support to $2,850, $2,839, and $3,045 per month for the years 2005, 2006, and 2007, respectively. Spousal support was reduced to $1,000 per month, effective January 1, 2007. The court later awarded Cindie her attorney fees.

Cindie has timely appealed from the second amended order; Jack has filed a cross-appeal.

## II. Cindie's Appeal

The sole issue in Cindie's appeal is whether the trial court had the power to reduce the amount of an existing child support order when the order was based upon the parties' agreement that child support is "absolutely non-modifiable downward." Cindie maintains that the trial court was "legally bound" by this contractual provision. The question is a legal one, subject to our independent review. (*In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371–1372 [40 Cal.Rptr.3d 910].)

Although the parties give it little attention, section 3651 is the general rule for modifying or terminating support orders, "whether or not the support order is based upon an agreement between the parties." (§ 3651, subd. (e).)[3] Section 3651, subdivision (a), provides: "Except as provided in subdivisions

---

[3] Cindie's only reference to section 3651 appears in a footnote, where she states, without analysis, that section 3651 "does not invalidate a parental agreement in an integrated marital settlement agreement to preclude downward modification of child support."

(c) and (d) and subject to [Family Code provisions not pertinent here], a support order may be modified or terminated at any time as the court determines to be necessary." Subdivision (c) of section 3651 prohibits modification of "an amount that accrued before the date of the filing of the notice of motion." And subdivision (d) of section 3651 prohibits modification of a *spousal support* order based upon the parties' agreement that "spousal support is not subject to modification or termination." Thus, under express terms of section 3651, all support orders, even those based upon the agreement of the parties, are modifiable prospectively except *spousal support* orders that the parties have agreed may not be modified. Agreements pertaining to *child support* orders are not exempted from the general rule. May we infer such an exemption from the statutory scheme? We think not. ▪ " 'Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.]' (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230 [32 Cal.Rptr.2d 19, 876 P.2d 505].)" (*Rojas v. Superior Court* (2004) 33 Cal.4th 407, 424 [15 Cal.Rptr.3d 643, 93 P.3d 260].) We find no such legislative intent.

Cindie acknowledges that parents cannot, by agreement, prevent the court from increasing a child support order or otherwise limit the right of their minor children to support. (*Elkind v. Byck* (1968) 68 Cal.2d 453, 457–458 [67 Cal.Rptr. 404, 439 P.2d 316].) She maintains, however, that an agreement may set an absolute floor for support that the court is bound to honor. She rests her argument on *Puckett v. Puckett* (1943) 21 Cal.2d 833 [136 P.2d 1] (*Puckett*), *Newhall v. Newhall* (1958) 157 Cal.App.2d 786 [321 P.2d 818] (*Newhall I*), and *Newhall v. Newhall* (1964) 227 Cal.App.2d 800 [39 Cal.Rptr. 144] (*Newhall II*). These cases are inapplicable.

The *Puckett* line of cases concerned integrated property settlement agreements. (*Puckett, supra*, 21 Cal.2d 833; *Newhall I, supra*, 157 Cal.App.2d 786; *Newhall II, supra*, 227 Cal.App.2d 800.) As Witkin explains, "Under the law prior to 1967, an 'integrated' (nonseverable) property settlement agreement, approved by the court and incorporated in the judgment, was not thereafter subject to modification. It was necessary, therefore, to determine in each case whether the judgment merely incorporated an integrated, nonmodifiable property agreement or a hybrid agreement, which included a severable and modifiable support award. [¶] . . . [¶] If the agreement was nonseverable, its support provisions were not modifiable except as the agreement expressly provided." (11 Witkin, Summary of Cal. Law (10th ed. 2005) Husband and Wife, § 356, pp. 460–461.)

In *Puckett*, the husband sought to reduce his monthly payment to the wife but the Supreme Court determined that the monthly payments were part of a nonseverable property settlement agreement and, therefore, could not be modified. (*Puckett, supra*, 21 Cal.2d at pp. 842–843.) The court commented that, to the extent the payments were for support of the child, they "are not subject to reduction, but they might be increased by the court if the child's welfare requires it." (*Id.* at p. 843.) Out of context, the statement supports Cindie's position. But what the court meant was that, although the amount could be increased if warranted by the circumstances, "the amount could not be reduced because it was a part of a *property* settlement." (*Ibid.*, italics added.) Reducing the monthly payment would disturb the settled division of marital property. Jack's child support obligations do not reflect the parties' division of marital property and, in any event, current law has eliminated the problem posed by the type of property settlements considered in *Puckett*.

■ In 1967, the Legislature enacted what is now section 3585, which provides, "The provisions of an agreement between the parents for child support shall be deemed to be separate and severable from all other provisions of the agreement relating to property and support of the wife or husband. An order for child support based on the agreement shall be law-imposed and shall be made under the power of the court to order child support." Thus, under current law, child support orders are always severable from an agreement dividing the marital property and are imposed not by contract but by the power of the court. The *Puckett* analysis, which was also the basis of the decisions in the *Newhall* cases (*Newhall I, supra*, 157 Cal.App.2d at pp. 790–791; *Newhall II, supra*, 227 Cal.App.2d at p. 815), is inapplicable.

Cindie argues that the purpose of section 3585 was to enable the courts to enforce property settlement agreements by contempt and that the section should not be "extended" to allow the court to modify an agreement the parties had intended to be nonmodifiable. The argument is unavailing. It does not "extend" the statute to give effect to its plain meaning, which is that the child support payment, although originally based upon the parties' agreement, is imposed by law—it is an order of the court. Since the child support payment is imposed by law, when the court modifies the amount of the payment, the court is not modifying a private agreement, it is modifying its own order.

■ The Family Code allows parents to make an agreement pertaining to child support; but such an agreement is always "subject to approval of the court." (§ 4065, subd. (a).) This is not a question of first impression. Our Supreme Court explained over 30 years ago: "When a child support agreement is incorporated in a child support order, the obligation created is deemed

court-imposed rather than contractual, and the order is subsequently modifiable despite the agreement's language to the contrary." (*Armstrong v. Armstrong* (1976) 15 Cal.3d 942, 947 [126 Cal.Rptr. 805, 544 P.2d 941].) More recently, this court has emphasized: "It is true that parties may settle their disputes over child support by agreement. This state has a 'strong policy favoring settlement of litigation' over family law disputes. [Citation.] . . . But such agreements, to the extent that they purport to restrict the court's jurisdiction over child support, are void as against public policy. [Citations.] Children have the 'right to have the court hear and determine all matters [that] concern their welfare and they cannot be deprived of this right by any agreement of their parents.' [Citation.] Thus, these agreements are not binding on the children or the court, and the court retains jurisdiction to set child support irrespective of the parents' agreement." (*In re Marriage of Bereznak* (2003) 110 Cal.App.4th 1062, 1068–1069 [2 Cal.Rptr.3d 351] (*Bereznak*).)

Cindie maintains that *Bereznak* does not apply here because that case involved an agreement to arbitrate all child support disputes which, if enforceable, limited the trial court's power over child support issues, a result that is against public policy. Cindie maintains that agreements setting a floor of support should be favored for public policy reasons. But if, as Cindie maintains, the court is "legally bound" by such an agreement, then the agreement would have the effect of ousting the trial court of its jurisdiction over child support in particular circumstances. It is this limitation upon the court's power that *Bereznak* found to be void as against public policy. (*Bereznak, supra,* 110 Cal.App.4th at pp. 1068–1069.)

█ It is true that no California case of which we are aware has addressed the precise question of whether the court must honor an agreement setting an absolute minimum for child support. However, the statutory scheme and associated case law make no distinction between a court's jurisdiction to increase an order for child support and its jurisdiction to decrease it. Section 3651 makes all such orders "modifiable," which could mean a change in either direction. Furthermore, section 4053 instructs that in calculating child support, the court should adhere to the principles, among others, that "[b]oth parents are mutually responsible for the support of their children" (§ 4053, subd. (b)), and that "[e]ach parent should pay for the support of the children according to his or her ability" (*id.,* subd. (d)). Under Cindie's view, if the parties had previously agreed to prohibit any downward modification of the child support payment, then, even if circumstances change, the court would have to ignore those legislatively mandated principles and require the parent to pay an amount he or she cannot afford and that does not represent that parent's fair share of support.

■ At oral argument, Cindie stressed that agreements setting a floor for child support should be enforceable for public policy reasons, implicitly suggesting that more is always better than less for the child. While at first glance it might seem that respecting such an agreement would inevitably be in the best interests of the child, that might not always be so. Parents' circumstances are subject to adversities out of their control. A serious accident, catastrophic illness, or a flagging economy and the hard times that go along with it, can all interpose a reversal of fortune that would make it impossible for the parent to satisfy a preset level of child support. In such a situation, it would not be in the child's best interest to force the parent into a level of debt he or she has no ability to pay. Certainly there is no public policy that would require it. We conclude, therefore, that the court always has the power to modify a child support order, upward or downward, regardless of the parents' agreement to the contrary.

### III. JACK'S CROSS-APPEAL

#### A. Child Support

##### 1. Contentions

Although the trial court agreed with Jack that the child support order was modifiable, Jack maintains that the court erred in calculating the ultimate amounts he must pay. Jack argues that the trial court erred by characterizing the $6,000 he received from his mother every month as income. He claims that the money was either a loan or a gift and that neither is includable as income in the guideline child support calculation. He argues, in the alternative, that as to the $3,000 he received to pay his rent, it is the same thing as free rent, which, under In re Marriage of Loh (2001) 93 Cal.App.4th 325, 332 [112 Cal.Rptr.2d 893] (Loh), may be considered only as a circumstance warranting a departure from the guideline under section 4057 and not as part of guideline calculation itself. Jack also challenges the trial court's determination of Cindie's income and its refusal to modify the order for additional child support.

##### 2. Standards of Review

We review a child support order for abuse of discretion. (In re Marriage of Cheriton (2001) 92 Cal.App.4th 269, 282 [111 Cal.Rptr.2d 755].) In so doing, we determine " 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.] We do not substitute our own judgment for that of the

trial court, but determine only if any judge reasonably could have made such an order." (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753 [57 Cal.Rptr.3d 274] (*Schlafly*).) In exercising its discretion, however, the trial court must follow established legal principles. (*Ibid.*) To decide whether the trial court followed established legal principles and correctly interpreted the child support statutes, we apply the independent standard of review. (*In re Marriage of Pearlstein, supra,* 137 Cal.App.4th at pp. 1371–1372.)

### 3. Characterizing the $6,000

The trial court did not make an express finding about the nature of the money Jack received from his mother other than to designate it as "income." Jack objected to the finding, arguing that the money was a loan and loan proceeds are not income for child support purposes. (*In re Marriage of Rocha* (1998) 68 Cal.App.4th 514, 517 [80 Cal.Rptr.2d 376].) By finally designating the money as income, the court rejected Jack's argument that the money was a loan. The evidence amply supports the court's conclusion. Jack's mother had paid many of the children's expenses for most of their lives. She had given Jack and Cindie $4,000 per month during their marriage. She had paid the bulk of Jack's legal bills associated with this litigation, and had volunteered to make up the difference in Jack's support payments. There was no evidence that Jack had ever repaid any of the money. A logical inference would be that Jack's mother was very generous and did not expect to be repaid. Since there is no dispute that Jack's mother was not his employer, the court must have determined that the money was a gift.

### 4. Characterizing the Gifts as Income

Jack argues that even if the money was a gift, gifts are not income for purposes of calculating support payments. We reject such an absolute rule.

The mandatory formula for calculating child support takes into account both parents' "net monthly disposable income" (§ 4055, subds. (a), (b)), which is determined based upon the parents' "annual gross income" (§ 4058). Section 4058, subdivision (a), defines "annual gross income" as "income from whatever source derived," and lists more than a dozen possible income sources to be considered as part of annual gross income.[4] That list

---

[4] Section 4058 provides in full:

"(a) The annual gross income of each parent means income from whatever source derived, except as specified in subdivision (c) and includes, but is not limited to, the following:

"(1) Income such as commissions, salaries, royalties, wages, bonuses, rents, dividends, pensions, interest, trust income, annuities, workers' compensation benefits, unemployment

includes wages, salaries, dividends, interest, workers compensation benefits, and business income. (§ 4058, subd. (a)(1), (2).) The section gives the court discretion to include employee benefits (*id.*, subd. (a)(3)) and to consider the parent's earning capacity in lieu of actual income (*id.*, subd. (b)). Subdivision (c) of section 4058 contains a short list of exclusions from gross income. Section 4058 does not mention gifts at all. The question, therefore, is whether gifts may be considered income for purposes of section 4058.

■ In interpreting section 4058, our goal is to ascertain the intent of the Legislature. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) We do that by first examining the statutory language, giving the words their usual and ordinary meaning. (*Ibid.*) If the statutory language permits more than one reasonable interpretation, we may resort to extrinsic aids, including the rules of statutory construction and consideration of the evils to be remedied by the statutory scheme at issue, to help us select the interpretation that comports most closely with the lawmakers' intent. (*Ibid.*)

■ We begin by noting that the list of income sources in section 4058, subdivision (a), is expressly described as a nonexclusive list. The listed items "are *by way of illustration* only. Income from other sources . . . should properly be factored into the 'annual gross income' computation." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2008) ch. 6-A, § 6:201, p. 6-85 (rev. # 1, 2007).) In contrast, section 4058, subdivision (c), contains a specific list of exclusions. Thus, for purposes of the computing child support under the statutory guidelines, "income" should be broadly defined while the exclusions are specific and must be narrowly construed. (*Asfaw v. Woldberhan* (2007) 147 Cal.App.4th 1407, 1425 [55 Cal.Rptr.3d 323].) Furthermore, although section 4058 does not list gifts among its examples of income, it does say that annual gross income is "income" from "whatever source derived," which might easily include some

insurance benefits, disability insurance benefits, social security benefits, and spousal support actually received from a person not a party to the proceeding to establish a child support order under this article.

"(2) Income from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business.

"(3) In the discretion of the court, employee benefits or self-employment benefits, taking into consideration the benefit to the employee, any corresponding reduction in living expenses, and other relevant facts.

"(b) The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children.

"(c) Annual gross income does not include any income derived from child support payments actually received, and income derived from any public assistance program, eligibility for which is based on a determination of need. Child support received by a party for children from another relationship shall not be included as part of that party's gross or net income."

types of gifts. Indeed, if the Legislature had intended to exclude all gifts from the income calculation, it surely could have listed them among the specified exclusions. (Cf. *In re Marriage of Henry* (2005) 126 Cal.App.4th 111, 119 [23 Cal.Rptr.3d 707].) There is, therefore, nothing in section 4058 itself that precludes considering gifts as income for child support purposes.

Existing case law provides little guidance on the point. *In re Marriage of Scheppers* (2001) 86 Cal.App.4th 646, 649–650 [103 Cal.Rptr.2d 529], stated, in dictum, that inter vivos and testamentary gifts are not income within the meaning of section 4058. And it is settled that the principal amount of a one-time, lump sum gift or inheritance is not income but the rents, interest, or dividends generated by the gift are income. (*County of Kern v. Castle* (1999) 75 Cal.App.4th 1442, 1453 [89 Cal.Rptr.2d 874].) What the published cases have not addressed is how to characterize recurring, monetary gifts such as those Jack received from his mother.

*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519 [70 Cal.Rptr.2d 488] (*Schulze*) involved recurring benefits that the payor spouse received from his parents. The appellate court noted in passing, "Gifts are not mentioned in section 4058, and, judging from the use of language lifted straight from the Internal Revenue Code, should logically be outside the purview of the child support statute. Gross income, in federal tax law, does not include gifts." (*Schulze, supra*, at p. 529, fn. omitted.) *Schulze* concluded, however, that the benefits were includable as income because the parent's parents were also his employers and, therefore, the gifts were "employee benefits" which could be considered "income" under section 4058, subdivision (a)(3). *Schulze* was not called upon to consider the really "tough case," namely "that of the scion of a wealthy family whose parents are *not* his or her employers and who still manages to live quite well even on a low annual gross income as defined by section 4058 because of bona fide nontaxable *gifts* from his or her parents." (*Schulze, supra*, at p. 530, fn. 10.) That is the case before us.

Since section 4058 does not define "income," we turn first to the common meaning of that word to discover the Legislature's intent. The standard definition of "income" is simply "a gain or recurrent benefit that is usu[ally] measured in money and for a given period of time, derives from capital, labor, or a combination of both . . . ." (Webster's 3d New Internat. Dict. (1993) p. 1143, col. 3.) The common law is the same: "The traditional understanding of 'income' is the gain or recurrent benefit that is derived from labor, business, or property [citation] or from any other investment of capital." (*In re Marriage of Scheppers, supra*, 86 Cal.App.4th at p. 650.) Recurring gifts of money would fit both these definitions except that gifts are

not derived from labor, business, or property. That source of the benefit is not universally required, however. One legal dictionary defines income as "[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, *gifts* and the like." (Black's Law Dict. (8th ed. 2004) p. 778, col. 1, italics added.) Thus, the common definitions of "income" do not unequivocally preclude considering recurring gifts of money as income.

We recognize that the definition of annual gross income in section 4058 is taken from language used in the Internal Revenue Code. (*Loh, supra,* 93 Cal.App.4th at p. 332; see 26 U.S.C. § 61.) Because of this, some courts have proposed a rather formalistic, tax-model approach to determining what the Legislature intended to include as income under section 4058. In *Loh,* the appellate court rejected a rule, implicit in *Stewart v. Gomez* (1996) 47 Cal.App.4th 1748, 1755 [55 Cal.Rptr.2d 531], which would make anything that reduces living expenses "income" for purposes of the child support calculation. In *Stewart,* the appellate court held that the value of the parent's living rent free on an Indian reservation should be includable as income. (*Id.* at pp. 1751, 1755.) *Loh* disagreed with *Stewart,* noting that such noncash benefits were not income for tax purposes and, therefore, should not be considered income for purposes of section 4058. *Loh* held, "A parent's gross income, as stated under penalty of perjury on recent tax returns, should be presumptively correct." (*Loh, supra,* at p. 332.) This court followed the *Loh* approach in *Schlafly, supra,* 149 Cal.App.4th at page 758.

In holding that the income stated on the tax returns was the presumptively correct amount, *Loh* noted that use of that standard "accords with the Legislature's goal of uniformity and expedition." (*Loh, supra,* 93 Cal.App.4th at p. 333.) It is a relatively easy way of identifying realistic income figures and spares "chronically overcrowded family courts the burden of determining income on an ad hoc basis, with the risk of inconsistent results." (*Ibid.*) But *Loh* and *Schlafly* do not control the result here because the concern in those cases was the trial courts' having included *noncash* benefits, unrelated to employment, in the income calculation. (*Loh, supra,* at p. 327; *Schlafly, supra,* 149 Cal.App.4th at p. 757.) With noncash benefits, the court must make ad hoc determinations of the value, which are more complicated to do and could lead to inconsistent results. These concerns are not present with gifts of cash. Cash gifts are readily valued. Furthermore, since the purpose of the calculation is to determine how much money a parent has available for the support of the minor children, ignoring gifts that form a part of the parent's regular cash flow would give an unrealistic picture of the parent's ability to pay. It follows that, even if recent tax returns set forth the presumptively correct amount of income, the presumption could be rebutted by evidence of

recurring gifts of money that form a regular part of the parent's income picture. (See *In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28, 34 [33 Cal.Rptr.3d 246] [parent's statement of income on loan application showed parent earned more than stated on tax returns].)

 It is true that gifts are not included as income under federal tax law. But federal tax law is not conclusive. (*In re Marriage of Rothrock* (2008) 159 Cal.App.4th 223, 231 [70 Cal.Rptr.3d 881].) In fact, section 4058 specifically includes some types of income, such as workers' compensation payments, that are excluded from taxable income under the Internal Revenue Code. (26 U.S.C. § 104(a)(1); *In re Marriage of Scheppers, supra*, 86 Cal.App.4th at pp. 649–650.) And the Internal Revenue Code's express exclusion of gifts and inheritances (26 U.S.C. § 102) is not found in section 4058. These disparities flow from the differing purposes of the two legal schemes. The Internal Revenue Code does not so much define the term "income" as identify that which, consistent with prevailing federal tax policy, might be taxed. (See White, *Realization, Recognition, Reconciliation, Rationality and the Structure of the Federal Income Tax System* (1990) 88 Mich. L.Rev. 2034, 2040.) In contrast, California's child support statutes are designed to ensure that parents take "equal responsibility to support their child in the manner suitable to the child's circumstances." (§ 3900.) Section 4053, which lists the principles to be followed by the court in setting the child support award, states that the guideline takes into account the parents' *"actual* income," not their *taxable* income. A parent may have income that is not taxable but that would be available for support of the child. For example, components of a personal injury award paid on account of physical injury might be considered as income for child support even though such funds are expressly excluded from gross income under the Internal Revenue Code. (26 U.S.C. § 104(a)(2); *In re Marriage of Heiner* (2006) 136 Cal.App.4th 1514, 1524 [39 Cal.Rptr.3d 730].) Therefore, while the tax model will be helpful in many cases, it is not controlling.

Whether gifts may be included as income in the child support calculation is a matter of some dispute among our sister states. Some state courts have declined to consider gifts as income. (See *Nass v. Seaton* (Alaska 1995) 904 P.2d 412, 416 [gifts as income "blurs the easily administered and well-established historical distinction between gifts and earned income"].) Many of the courts that have refused to consider gifts as income have done so because the donor of the gift has no legal obligation to continue giving. (*True v. True* (Me. 1992) 615 A.2d 252, 252–253; *Ikard v. Ikard* (Tex.Ct.App. 1991) 819 S.W.2d 644; *Huebscher v. Huebscher* (N.Y.App.Div. 1994) 206 A.D.2d 295 [614 N.Y.S.2d 524].) Other courts, however, have considered gifts to be income where the gifts are recurring, cash gifts in predictable

amounts. (*Ordini v. Ordini* (Fla.Dist.Ct.App. 1997) 701 So.2d 663, 664 [gifts from husband's parents who had supported couple during marriage are income]; *Unkelbach v. McNary* (1998) 244 Conn. 350, 365 [710 A.2d 717] [regular gifts to parent are income]; *In re Marriage of Petersen* (Mo.Ct.App. 2000) 22 S.W.3d 760, 764 [same]; *Barnier v. Wells* (Minn.Ct.App. 1991) 476 N.W.2d 795, 797 [regular gifts from dependable party may be income].) In our view, these latter cases present the better approach.

The Illinois Supreme Court considered a case much like the one before us and concluded that cash gifts may properly be included in the child support calculation. In *In re Marriage of Rogers* (2004) 213 Ill.2d 129 [289 Ill.Dec. 610, 820 N.E.2d 386], the father received gifts and loans from his family which, so the mother claimed, amounted to " 'a steady source of dependable annual income . . . he has received each year over the course of his adult life.' He has never had to repay any portion of those sums, nor has he been required to pay tax on them." (*Id.*, 213 Ill.2d at p. 134.) *Rogers* held that these gifts fell within the definition of income contained in the Illinois statute, which defined net income as " 'the total of all income from all sources' " minus specific deductions. (*Id.* at p. 133, quoting 750 Ill. Comp. Stat. 5/505(a)(3).) "That the gifts may not have been subject to taxation by the federal government is of no consequence. They represented a valuable benefit to the father that enhanced his wealth and facilitated his ability to support [the minor child]." (*In re Marriage of Rogers, supra*, at p. 137.) The court also rejected cases holding that a gift could not be income merely because there was no guarantee that the parent would continue to receive such gifts in the future. "Few, if any, sources of income are certain to continue unchanged year in and year out. People can lose their jobs, interest rates can fall, business conditions can wipe out profits and dividends. Accordingly, the relevant focus under [the Illinois statute] is the parent's economic situation at the time the child support calculations are made by the court." (*Id.* at p. 138.) "[I]f the payments should stop earlier than anticipated by the court, the parent obligated to provide support based on those payments may seek modification of the support order . . . ." (*Id.* at p. 139.)

The same reasoning is applicable here. Much like the Illinois statute that defines "income" as "the total of all income from all sources," section 4058 defines "annual gross income" as "income from whatever source derived." This definition is broad enough to encompass gifts that bear a reasonable relationship to the traditional concept of income as a recurrent, monetary benefit. It is irrelevant that there is no legal obligation on the part of the donor to continue making the gifts or that the flow of cash does not appear on the income tax return.

We conclude that nothing in the law prohibits considering gifts to be income for purposes of child support so long as the gifts bear a reasonable

relationship to the traditional meaning of income as a recurrent monetary benefit. But while regular gifts of cash may fairly represent income, that might not always be so. Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court.

 Turning to the facts of this case, we note that Jack has been receiving regular cash payments from his mother for over a decade. The periodic and regular nature of the payments means that the money is available to Jack for the support of his children. The trial court, therefore, did not abuse its discretion in considering the amount to be income.

Jack argues that the court should not have included the $3,000 his mother gives him to pay his rent in the income tally, but was required to use it only as a circumstance to adjust the support award under sections 4056 and 4057. Although the court might have proceeded that way, it was not necessary to have done so. If Jack had only the benefit of rent-free living, valuing the benefit and including it as part of the income calculation could give an inaccurate picture of his cash flow situation and, in that situation, it would have been inappropriate to characterize the value of the benefit as income. This is why *Loh* held that noncash benefits could not be used to calculate income but could represent a circumstance that would warrant an upward adjustment, under sections 4056 and 4057, of the amount calculated under the statutory formula. (*Loh, supra*, 93 Cal.App.4th at p. 327; see also *Schlafly, supra*, 149 Cal.App.4th at pp. 759–760.) But here, Jack's mother did not simply give him the benefit of living in the home; she gave him the money to pay for it. Thus, the benefit was easily valued and represented part of Jack's monthly cash flow. In sum, any judge could have reasonably concluded that all of the $6,000 was income and, therefore, reversal for an abuse of discretion is not required. (*In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1360 [119 Cal.Rptr.2d 430].)

### 5. *Calculating Cindie's Income*

Jack makes two arguments pertaining to the trial court's calculation of Cindie's income. First, he argues that the trial court ignored recurring dividends Cindie received from accounts her father maintained on her behalf. He claims that, since Cindie received notice of $10,319 in dividends attributed to her Social Security number in 2005, and since those dividends were generated from joint accounts she presumably continued to own jointly with her father, the court should have imputed the same amount of dividends to her for subsequent years. Cindie explained, however, that, although she received notice of the dividends, she never received the money and, for all practical purposes, had no access to the accounts. Cindie's 2007 income and

expense declaration showed that she had actually received only $50 per month in dividends that year. On this evidence the trial court could have ignored the great majority of the 2005 dividends but, instead, the court accepted the $10,319 figure for 2005 (roughly $860 per month), accepted a lower figure of $100 per month for 2007, and came up with an approximate average for the 2006 amount. In effect, the court imputed income to Cindie for 2005 that she never received. The figures for later years reflected more closely that which Cindie actually had available for support of the children. Thus, the ruling was not prejudicial to Jack.

Jack also argues that the trial court should have attributed income to Cindie based upon the money his mother spent directly on the children's expenses. Jack supplies no authority for the proposition, nor did he raise the argument below. Accordingly, we need not consider it. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126] [the absence of argument and citation to authority in the appellant's briefs allows the appellate court to treat the contentions as waived]; *In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 144 [61 Cal.Rptr.2d 559] [errors in calculating child support must be brought to the attention of the trial court while the error may still be corrected].)[5]

### 6. *The Failure to Modify the Order for Additional Child Support*

Jack maintains that the trial court erred in failing to reduce the additional child support he was required to pay. He claims that since the base support payment was modifiable, the trial court should have modified the add-ons, as well. It is clear from the record that the trial court did not conclude that the add-ons were nonmodifiable, as Jack's appellate argument suggests. Rather, the court stated "I did not receive evidence substantial enough to modify that portion of the agreement." Indeed, the evidence was that Jack, or Jack's mother on Jack's behalf, had been regularly providing the additional child support. Jack points to no evidence to show that circumstances had changed such that he could no longer meet those obligations. Accordingly, Jack has failed to demonstrate that the trial court abused its discretion in declining to modify the order for additional child support.

### B. *Spousal Support*

Finally, Jack claims that the trial court erroneously interpreted the MSA as setting a "floor" of $1,000 for spousal support. This issue involves interpretation of the terms of the MSA, a purely judicial function. Since there is no

---

[5] Jack also argues that, if we reverse the trial court's determination of the parties' income, then the order awarding attorney fees to Cindie must be reversed. Since we find no error in the trial court's income determinations, we need not reach this argument.

conflict in the extrinsic evidence, we make an independent determination of the meaning of the agreement. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].)

The MSA provided that Jack would pay Cindie $3,000 per month in spousal support. If Cindie's portion of Jack's inheritance came to her in the form of periodic payments, then the $3,000 per month spousal support could be reduced, "[b]ut in no event shall said spousal support . . . be in an amount less than one thousand ($1,000.00) dollars per month, regardless of the size of any inheritance monies Wife may receive." The spousal support payment could also be reduced to $1,000 if Cindie's income from active employment exceeded $75,000 per year or if, upon remarriage, her new spouse had an annual income or net worth exceeding specified amounts.

The trial court's first order found: "Portions of the Spousal Support agreements are described as non-modifiable." In the first amended order the trial court confirmed the orders and findings of the original order, found that "[b]oth sides signed a Marital Settlement Agreement which set a floor for support," and reduced the spousal support payment to $1,000. In response to Jack's objections, the second amended order stated, "The court affirms that after having considered all of the factors contained in Family Code section 4320 as described in the first Amended Order filed on 9 July 2007, $1000 per month spousal support is payable by petitioner to respondent effective 1 January 2007."

Jack argues that the trial court's express findings show that the court erroneously interpreted the MSA as setting a floor of $1,000 per month for child support. We agree that the MSA did not make the spousal support order absolutely nonmodifiable to less than $1,000. Rather, it specified the $1,000 floor would apply if Cindie received a stream of income from her portion of Jack's inheritance or when her own salary or that of a new spouse reached a certain level. Indeed, Cindie implicitly concedes that the MSA does not set an absolute minimum since she argues only that the court never found that it did.

Because Jack specifically objected to the trial court's findings pertaining to the spousal support order, we do not imply findings in support of the judgment. (Code Civ. Proc., § 634.) Although in the first order the court found only that "portions" of the spousal support agreement were described as nonmodifiable, the first amended order specifically found that the MSA "set a floor for support." The second amended order did not delete or modify that finding. Since that finding is not supported by the evidence, the matter must be reversed for the court to reconsider the spousal support component of the second amended order.

## IV. Disposition

The order of the trial court dated October 29, 2007, is reversed. The matter is remanded to the trial court to reconsider, in light of the opinion expressed herein, its order for spousal support.

The parties shall bear their own costs on appeal.

Rushing, P. J., and Elia, J., concurred.