Filed 10/29/24  Marriage of Singhal CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of JENNIFER A. and SHELLY S. SINGHAL. | B329555 |
| | (Los Angeles County Super. Ct. No. 17PDFL00948) |
| JENNIFER A. SINGHAL, | |
| Petitioner, | |
| v. | |
| SHELLY S. SINGHAL, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dean H. Hansell, Judge.  Affirmed.

Benice Law and Jeffrey S. Benice for Appellant.

Law Office of Gary W. Kearney and Gary W. Kearney for Petitioner.

_____

Appellant Shelly S. Singhal (Shelly) appeals from the trial court's judgment awarding child support to his former wife, Jennifer A. Singhal (Jennifer).[1]  Shelly argues that the trial court erred in calculating income available for child support, by (1) failing to include in Jennifer's income the loans she received from her parents and (2) relying on the testimony of a cannabis expert to estimate Shelly's income.  Finding no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

I.     <u>The Marriage and Dissolution</u>

Shelly and Jennifer married in July 2001 and have four children together.  The couple separated in 2017.  Jennifer filed for divorce in February 2018.

In October 2018, the trial court entered a temporary order resolving several issues pursuant to the parties' stipulation.  Among other things, Shelly stipulated that "his monthly self-employment income was $12,000[.]"  Based on that income, Shelly was required to (1) pay Jennifer a base $5,500 per month in child support and $700 per month in spousal support and (2) transfer 20 million shares of stock in LiveWire Ergogenics (LiveWire stock) to Jennifer so that she could sell enough stock to pay the community's monthly debts and give $50,000 each to herself and Shelly.

_____

[1]     Because the parties to this appeal share the same last name, we refer to them by their first names for ease of identification.  No disrespect is intended.

The trial court issued a judgment terminating the parties' marital status on October 14, 2022. It reserved jurisdiction over all remaining issues.

II.   Trial

Pursuant to a later stipulation from the parties, the matter proceeded to a bifurcated bench trial on the issue of income available for child support.[2] Shelly continued to assert that his income was $12,000 per month; Jennifer contended that his monthly income was $50,000~.

The trial took place over four days in October 2022. Shelly represented himself; Jennifer was represented by counsel.

A.   *Jennifer's testimony*

Jennifer testified that Shelly worked in the cannabis industry as a broker, paying farms millions of dollars for marijuana which he would then sell to various groups and dispensaries. Shelly told Jennifer that because "everything he did was in cash[,]" "there's no way [she would] be able to prove any of this . . . Jennifer] c[ould] never find anything on" Shelley.

Jennifer also claimed that Shelly never paid child support in full. Moreover, Shelly refused to cooperate in the transfer of the LiveWire stock, preventing Jennifer from accessing those funds to pay the community's outstanding debts and the family's living expenses.

To cover these costs, Jennifer received loans from her parents in the amount of 1.3 million dollars. At the time of the trial, Jennifer had repaid over $147,000 of those loans.

Jennifer admitted that she and Shelly had borrowed a total of $170,000 from her parents during the last two years of their

---

[2]     This phase of trial also addressed attorney's fees; on appeal, Shelly does not challenge that aspect of the judgment.

marriage, "always [with] the goal" of "pay[ing] them back." She testified that Shelly told her those loans had been repaid.

B.  *Shelly's testimony*

Shelly admitted that, during a January 2020 deposition, he had claimed to work as a consultant for "'a number of individuals in the cannabis industry[,]'" "'assist[ing] them in finding distribution platforms for product.'" He also testified that he paid his lawyers in cash, but denied having a "bank, savings, or brokerage account" or any money other than what was in his wallet.

On his own cross-examination, Shelly did not admit to any amount of income. Instead, he argued that Jennifer could not prove her estimation of his income with "third-party records," and alleged that Jennifer "has unlimited access to funds" in the form of loans from her parents.

C.  *Jennifer's mother's testimony*

Jennifer's mother, Jo Jeanne Angeloff (Angeloff), testified that while there was no hard date for repayment of the loans, Jennifer "has been paying back money every month[.]"

D.  *Certified public accountant's testimony*

Jennifer introduced testimony from a certified public accountant, Jackie Adams-Ings (Adams-Ings), who conducted an analysis of Shelly's spending "based upon his monthly expenses" "for the period January 2019 to December 2020." Shelly stipulated to Adams-Ings's expertise in this area.

Adams-Ings testified that during the "two-year time period" between "January 2019 [and] December 2020[,]" Shelly's "average monthly expenses of spending . . . was $50,656 per month." Adams-Ings noted that "this was an abnormal case" because Shelly conducted most of his business in cash, resulting in a "lack

4

of documentation, [a] lack of bank accounts, [a] lack of credit cards."

E.  *Cannabis industry expert's testimony*

Jennifer also offered testimony from an attorney, Allison Margolin (Margolin), as an expert "[i]n the area of the business involved in the manufacture, distribution, and retail sales of—in the marijuana industry in Southern California" "and the . . . expected profits and income" of "executives and owners of [that] business."

1.  <u>*Declaration*</u>

In her declaration, Margolin gave numerous qualifications for her expertise, including that she (1) founded two "leading cannabis law firm[s]"; (2) "represented hundreds of defendants in state and federal cannabis-related criminal cases throughout California[,]" including "cases involving allegations of cannabis-related tax evasion and money laundering"; (3) "represented approximately 200 clients seeking to establish licensed cannabis businesses," which "involved in many discussions regarding valuations of cannabis businesses, and incomes and profits for owners of cannabis businesses"; and (4) "closely followed the changes in economics of the cannabis industry" and "the finances of the illicit, unlicensed, and unregulated cannabis industry."

Margolin was asked to give opinions regarding, among other things, "[t]he current structure of the marijuana/cannabis industry" and "[t]he income that would be received by an owner/executive involved within certain parameters of the marijuana industry."

To form an opinion about the potential income of a cannabis executive, Margolin adopted several hypotheses about business, including that (1) "[t]he business is involved in the

manufacturing, brokering, sales, and/or distribution of marijuana/cannabis . . . in California"; (2) "[t]he business is the biggest cannabis business in the United States"; and (3) "[t]he business is a $100,000,000 business."  Margolin opined that a principal in such a business "would have an annual income in the range of $3 to $6 million per year from commercial cannabis activities."

        2.    *Trial testimony*

The parties stipulated to accepting Margolin's declaration as her direct testimony at trial.

Shelly objected to Margolin's testimony, arguing that "[s]he has no basis to speak on finances of marijuana companies when her education is [in] law school."

Margolin reiterated the qualifications in her declaration, adding that in her work representing licensed cannabis companies or individuals, she "had to create business plans for all those clients that include potential profit and losses[.]"  The trial court found that Margolin "amply satisf[ied]" the statutory requirements to be an expert witness.

On cross-examination, Margolin opined that although the marijuana industry was not "more profitable today than it was two years ago[,]" commercial retailers could increase their profit margins by maintaining consistent retail pricing as wholesale cannabis prices decreased.

III.   <u>Rulings and Judgment</u>

On April 6, 2023, the trial court entered the judgment of dissolution.  The judgment incorporated rulings on various issues, including, as relevant to this appeal, the parties' income available for child support.

A.    *Credibility*

The trial court "d[id] not find Shelly to be an honest reporter of facts.  He was often evasive and cagey in his response to questions, especially about his finances.  He also showed an indifference to accuracy and completeness when it came to his income and expense declarations filed in this case . . . [and] his testimony was frequently contradicted by documents and by Jennifer's testimony."  Conversely, "[t]he court found Jennifer to be credible . . . .  Her testimony is consistent with the exhibits and she readily acknowledges weaknesses."  The court similarly "found . . . Angeloff to be credible[.]"

B.    *Jennifer's income*

The trial court ruled that Jennifer's "combined monthly income [is] $1,831[.]"

The trial court did not "attribute income to [Jennifer] from monies borrowed from her mother to pay her . . . bills."  It explained that, per Jennifer's testimony, "she had not intended to borrow money from her mother[,] but was forced to do so" because Shelly had neither (1) transferred the LiveWire stock to Jennifer's name nor (2) paid his court-ordered support obligations in full.  "Accordingly, the court decline[d] to enable Shelly to benefit from his lack of cooperation and his failure to pay what he owed in child and spousal support" by counting the parental loans towards Jennifer's income.

C.    *Shelly's income*

The trial court ruled that Shelly's "monthly income is at least $47,540 monthly commencing January 1, 2019[.]"  To calculate Shelly's income, the court relied exclusively on Adams-Ings's analysis.

7

The trial court discredited Shelly's contrary evidence, saying that "to call [his] income and expense declarations . . . unreliable is an understatement[,]" and that his "own testimony . . . create[d] a financial picture that is both opaque and lacks credibility."

The trial court noted that it also rejected Margolin's testimony on "the income to be received by an owner/executive of the [cannabis] industry[,] because [Margolin is] neither a [certified public accountant] nor an economist. Of most significance, the court found [Margolin's] primary conclusion" about the amount of money a cannabis executive "could be expected to receive as annual income" was not supported by anything other than the "17 assumptions she was asked to make, many of which were not otherwise established."

However, the trial court accepted Margolin's testimony that "[t]he cannabis industry . . . is not necessarily less profitable today than it was in 2020, although the price that pot farmers can obtain for a pound of marijuana is way down . . . [i]f other parts of the cannabis industry are able to maintain their prices, [e.g.,] distributors and pot dispensaries, then their profits may actually go up[.]" Because "[t]he court received testimony that Shelly purchased pot from farmers, manufactured it into finished products, and then sold it to dispensaries[,]" it concluded that "his profit levels in 2022 would actually be the same or better than they would be in 2020."

In adopting Margolin's conclusions about the stability of the retail cannabis market, the trial court noted that it "received no contrary evidence that Shelly's income has dropped[.]"

D.    *Child Support*

Based on the parties' available incomes, the trial court ordered Shelly to pay a total of $12,463 per month in child support, along with $338,449.13 in arrearages.

IV.    Appeal

Shelly timely appealed.

## DISCUSSION

Shelly argues that the trial court abused its discretion by (1) failing to consider parental loans as part of Jennifer's income and (2) accepting Margolin's expert testimony.

I.    Parental Loans

A.    *Applicable law*

Section 4055 of the Family Code establishes a formula that trial courts must use to calculate child support.  (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1312 (*Williamson*).)  The formula "takes into account both parents' 'net monthly disposable income' ([Fam. Code,] § 4055, subds. (a), (b)), which is determined based upon the parents' 'annual gross income' ([Fam. Code,] § 4058)."  (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731 (*Alter*).)  With certain exceptions, "annual gross income . . . means income from whatever source derived[.]"  (Fam. Code, § 4058, subd. (a).)  In this context, "'income' should be broadly defined while the exclusions are specific and must be narrowly construed."  (*Alter*, *supra*, at p. 732.)

Loans, which carry an expectation of repayment, are generally not considered income under section 4058 of the Family Code.  (See *Williamson, supra*, 226 Cal.App.4th at p. 1312.)  However, "regular gifts of cash" may be deemed "income for purposes of child support so long as the gifts bear a reasonable relationship to the traditional meaning of income as a recurrent

9

monetary benefit." (*Alter, supra*, 171 Cal.App.4th at pp. 736–737.)

B.   *Standard of review*

"Child support awards are reviewed for an abuse of discretion. [Citation.]" (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1038 (*Morton*).) In particular, the question of what "should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court." (*Alter, supra*, 171 Cal.App.4th at p. 737.)

When reviewing for abuse of discretion, we must "determine whether the trial court's factual findings are supported by substantial evidence and whether the trial court reasonably exercised its discretion—that is, whether any judge reasonably could have made such an order." (*Morton, supra*, 27 Cal.App.5th at p. 1039.) Substantial evidence is "evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 507.)

C.   *Analysis*

Jennifer testified that the funds she received from Angeloff were loans. She did not seek the loans until after she and Shelly separated, and she only needed them to cover debts and living expenses that she was unable to pay due to Shelly's years-long refusal to comply with his court-ordered obligations. And she was repaying Angeloff to the best of her limited ability. Angeloff corroborated Jennifer's claims.

Jennifer and Angeloff's testimony—which the trial court explicitly found credible—substantially supports a finding that

10

the monies were loans.[3]  (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [the testimony of just one witness may constitute substantial evidence].)  And, as noted above, loans are generally not considered income available for child support.  (See *Williamson*, *supra*, 226 Cal.App.4th at p. 1312.)

Under these circumstances, we cannot find that the trial court abused its discretion in failing to consider the loans part of Jennifer's income.

In his opening brief,[4] Shelly disputes our conclusion, arguing that under *Alter*, *supra*, 171 Cal.App.4th 718, the trial court should have found that the monies were gifts.  His argument fails for two reasons.  <u>First</u>, *Alter* is distinguishable.  In that case, a father "receiv[ed] regular cash payments from his mother for over a decade."  (*Id.* at p. 737.)  She "had paid many of the children's expenses for most of their lives[,]" and gave her son and his ex-wife "$4,000 per month during their [11-year] marriage."  (*Id.* at pp. 723, 731.)  The *Alter* court found that "[t]he periodic and regular nature of the payments mean[t] that the money is available . . . for the support of [the] children."  (*Id.* at p. 737.)

---

[3]     Shelly contends that contrary evidence supports his position that the monies were gifts.  His argument is unavailing.  (*Reynaud v. Technicolor Creative Services. United States* (2020) 46 Cal.App.5th 1007, 1015 [under substantial evidence review, "'"we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" [Citation.]  . . .  We do not reweigh evidence or reassess the credibility of witnesses"'].)

[4]     Shelly did not file a reply brief.

11

Conversely, Jennifer did not start receiving money from Angeloff until after she and Shelly had separated.[5] Jennifer used the money to pay the children's expenses, but only needed to do so because Shelly withheld child support and community funds from her during the pendency of their divorce. And crucially, unlike the father in *Alter*, Jennifer consistently made efforts to repay Angeloff. These monies bear multiple hallmarks of loans, and were thus properly excluded from Jennifer's income.

Second, even if Angeloff had consistently gifted money to Jennifer, *Alter* does not require the trial court to consider gifts as income. (*Alter*, *supra*, 171 Cal.App.4th at p. 737 ["[W]hile regular gifts of cash *may* fairly represent income, that might not always be so. Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court."] [Italics added].)

Regardless of how the funds from Angeloff are characterized, Jennifer only needed that money during the pendency of the divorce, so that she could cover a temporary shortfall created by Shelly. The trial court acted well within its discretion in concluding that monies received to resolve a short-term financial emergency did not "bear a reasonable relationship to the traditional concept of income as a recurrent monetary benefit." (*Alter*, *supra*, 171 Cal.App.4th at p. 737.)

---

[5] Although Jennifer's parents had occasionally loaned the couple money during their marriage, those loans were fully repaid prior to trial.

II.    <u>Margolin's Testimony</u>

    A.    *Applicable law*

"A person is qualified to testify as an expert if [s]he has special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates.  Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert," and "may be shown by any otherwise admissible evidence, including [her] own testimony."  (Evid. Code, § 720, subds. (a), (b).)

"'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness'[] qualifications.' [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)  "'The competency of an expert "is in every case a relative one, i.e.[,] relative to the topic about which the person is asked to make his statement." [Citation.]'  [Citation.]  If an expert 'exhibits knowledge of the subject' on which she opines, she need not be a specialist; a general practitioner may suffice. [Citations.]" (*Grafilo v. Soorani* (2019) 41 Cal.App.5th 497, 510 (*Grafilo*).)

    B.    *Standard of review*

"The abuse of discretion standard applies to the trial court's admission of evidence [citation], including the determination of whether an expert is qualified to testify [citation]." (*Grafilo*, *supra*, 41 Cal.App.5th at p. 509.)

    C.    *Analysis*

In calculating Shelly's income available for child support, the trial court relied largely on the expert opinion of Adams-Ings, Jennifer's certified public accountant.

13

The trial court limited Margolin's expert testimony to her opinion that the cannabis economy remained relatively stable for retailers and dispensaries, even as the price of wholesale marijuana fell. Margolin's decades of legal work in the cannabis field, which included preparing basic financial projections for over 200 licensed marijuana businesses, amply establish her qualifications as an expert on general economic trends in the cannabis industry. We find no abuse of the trial court's discretion in admitting and relying upon Margolin's testimony for the narrow purpose of explaining those trends.

Shelly admits that the trial court disregarded "Margolin's conclusions concerning a person's expected annual income from a cannabis business[.]" Nevertheless, he insists that because Margolin relied on specious assumptions about the scope of his business to opine on his income, "[a]ll of [her] conclusions were meritless and should have been disregarded."[6]

Shelly pushes the argument one step too far. He is correct that the trial court should "act[] as a gatekeeper to exclude expert opinion testimony that is . . . based on reasons unsupported by the material on which the expert relies, or . . . speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771–772.) But here, the trial court did just that. It expressly rejected the portions of Margolin's testimony

---

[6] Shelly does not explain what effect Margolin's assumptions about his business had on her broader opinion about the cannabis industry. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["'We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' [Citations.]"].)

14

that were based on unsupported hypotheticals about Shelly's business, leaving only her qualified testimony about general economic trends in the cannabis industry.

## DISPOSITION

The judgment is affirmed. Jennifer is entitled to costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ