Filed 10/14/20  Marriage of Gallemore CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Marriage of RON P. and ESMERALDA GALLEMORE. | B294085 |
| RON P. GALLEMORE,<br><br>Respondent,<br><br>v.<br><br>ESMERALDA GALLEMORE,<br><br>Appellant. | (Los Angeles County Super. Ct. No. 18STFL00261) |

APPEAL from orders of the Superior Court of Los Angeles County, Roy L. Paul, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

John L. Dodd & Associates, John L. Dodd and Benjamin Ekenes for Appellant.

Young & Spiegel and Lance S. Spiegel for Respondent.

Esmeralda Gallemore appeals from a temporary spousal and child support order, in which the family court ordered her husband Ron[1] to pay $41,630 per month in pendente lite spousal support and $18,020 per month in child support. Esmeralda contends the court's order was not supported by substantial evidence because the court calculated Ron's income available for support based on erroneous revenue and expense projections for the eye clinic Ron owned, Retina Macula Institute (RMI). Esmeralda also appeals from the court's order denying her motion for new trial. We affirm both orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Ron and Esmeralda's Marital Dissolution Action*[2]

Esmeralda and Ron were married on July 4, 2004 and have twin sons born in 2011. Ron is an eye surgeon and the owner of RMI, a successful ophthalmology practice in Torrance. RMI employs Ron and five other physicians, in addition to several medical and support staff. Esmeralda worked as RMI's office administrator until the parties' separation. From 2013 through 2017 RMI had yearly gross revenues of more than $9 million. Ron and Esmeralda reported nearly $4 million in income from RMI on their 2016 joint tax return.

---

[1]    We refer to the parties by their first names because they share a last name.

[2]    The background facts are taken from Esmeralda's declaration in support of her request for temporary child and spousal support and from Ron's responsive declaration.

On January 9, 2018 Ron filed a petition for dissolution of marriage seeking joint legal and physical custody of the children. On January 10, 2018 Esmeralda filed a dissolution petition seeking sole custody of the children and spousal and child support.[3] On January 10, 2018 the family court granted Esmeralda's ex parte application for a temporary domestic violence restraining order preventing Ron from harassing or contacting Esmeralda and ordering him to stay away from Esmeralda and the parties' residence. Ron filed a responsive declaration opposing Esmeralda's request for a permanent restraining order and seeking his own domestic violence restraining order. In his supporting declaration, Ron stated Esmeralda unilaterally withdrew at least $390,000 from RMI's operating bank account.[4] On March 26, 2018 the family court (Judge John A. Slawson) denied the parties' requests for restraining orders.

---

[3] Ron's petition was assigned Los Angeles County Superior Court case No. 18STFL00261, and Esmeralda's petition was assigned case No. 18STFL00277. On January 31, 2018 the family court (Judge Shelley Kaufmann) ordered the two cases related and consolidated under case No. 18STFL00261.

[4] Esmeralda stated in her responsive declaration she withdrew $50,000 "in surplus funds from the practice account" on January 8, 2018 to pay her divorce attorney's retainer fee, and in November and December 2017 she transferred $340,000 from the RMI accounts into her own account because she was "afraid of being left with no access to funds." She stated she used a majority of those funds for her and the children's living expenses and "simply do[es] not have the funds to return to the business practice."

3

B.  *Esmeralda's Request for Temporary Spousal and Child Support*

On February 26, 2018 Esmeralda filed a request for order (RFO) on custody, visitation, child support, spousal support, and attorneys' fees.  In her attached income and expense declaration, Esmeralda stated she was unemployed and claimed monthly expenses of $207,736, including $15,000 for child care;[5] $14,000 for food and household expenses; $19,000 for hair, make-up, skin care, and other personal expenses; $7,000 for a personal assistant; and $5,200 for a dance coach.  She reported $12,500 in monthly rental income from the family home and $150,000 in cash and checking accounts.  Esmeralda sought pendente lite spousal support and child support.  Esmeralda's forensic accountant Alfred Warsavsky calculated guideline support at $37,557 per month in child support and $108,206 per month in spousal support.  Esmeralda sought sole legal and physical custody over the children, with Ron visiting the children three days a week.  She also sought $250,000 in attorneys' fees and costs.

On March 19, 2018 Ron filed a responsive declaration in opposition to Esmeralda's request in which he requested joint custody of the children with an equal timeshare based on each parent having the children on two weekdays and alternating three-day weekends, pending a custody evaluation.  Ron agreed to pay guideline child support and temporary spousal support

---

[5]     At the hearing on the RFO, Esmeralda testified she was currently paying four nannies $4,000 each per month to care for the children and had reduced the number of nannies from five because she was no longer working.

4

based on the analysis of his forensic accountant, Scott Decker. Ron submitted two DissoMaster[6] reports, one providing for $7,078 in monthly child support and $20,335 in spousal support and the other providing for $7,233 in child support and $20,884 in spousal support.[7] In his income and expense declaration, Ron stated he received $65,000 in monthly salary and $250,000 in monthly business income from RMI, and his monthly expenses were $17,164.

C.    *Hearing on Esmeralda's Request*

The family court[8] heard the RFO on April 24, April 25, and May 8, 2018. Prior to the hearing, the parties stipulated that for the 12 months ending December 13, 2017, Ron's reported income was $780,000 and RMI generated a net income of $3,019,060. The parties also stipulated Ron's timeshare with the children was 17 percent. Esmeralda, Ron, Warsavsky, and Decker testified at the hearing, as well as Timothy Hughes, an accountant who for

[6]    DissoMaster is a computer software program widely used by courts and the family law bar in setting child and spousal support pursuant to the statewide uniform guidelines set by the Family Code and local rules. (See *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 5, fn. 3.)

[7]    Decker explained the two DissoMaster calculations differed based on whether RMI perquisites were included as taxable or nontaxable income.

[8]    The parties stipulated to have the matter heard by Judge Roy L. Paul, a retired judge of the Los Angeles County Superior Court, as a temporary judge appointed pursuant to California Rules of Court, rule 2.831 and article VI, section 21, of the California Constitution.

three years provided accounting, controller, and bookkeeping services to RMI and accounting services to Ron and Esmeralda.

For purposes of the hearing, the experts prepared a joint report addressing 18 topics of disagreement concerning the RMI income attributable to Ron, four of which are at issue in this appeal. Decker took the position RMI's net income should be adjusted downward from the income reported in RMI's 2017 financial statements to account for lost practice income due to a reduction in Ron's work hours, depreciation expenses, unpaid taxes, and replenishment of cash reserves for operations. Warsavsky rejected all of the downward adjustments and took the position more than $500,000 of perquisites should be added to Ron's income available for support, in addition to several smaller upward adjustments. Decker opined Ron's monthly income available for support was $223,372; Warsavsky opined Ron's monthly income available for support was $392,146.

D.    *Statement of Decision and Findings*

On July 18, 2018 the family court issued its statement of decision, ordering Ron to pay $41,630 per month in temporary spousal support and $18,020 per month in temporary child support commencing January 15, 2018.[9] In its statement of decision, the court ruled on each of the parties' 18 topics of disagreement. In addition, the court examined Esmeralda's reasonable needs and found her trial testimony was not credible,

---

[9]    On May 25, 2018 the family court issued a proposed statement of decision, and on June 6 Esmeralda filed objections. The court sustained one of Esmeralda's objections concerning the parties' real property and overruled the others.

explaining, "[Esmeralda's] testimony was evasive, she had no recall of many facts, as well as an unwillingness to answer or a failure to understand very simple straightforward questions. She appeared to have selective recall as to the business operations as well as her personal expenses." Among other things, Esmeralda's "stated personal expenses appear greatly overinflated and exaggerated" and "included many unsupported numbers that have no foundation and have changed during testimony." She also "presented contradictory evidence regarding the existence and uses of a tax savings account." The court noted Esmeralda stated she used QuickBooks accounting software for her personal finances but failed to produce the data files to Ron's expert, despite multiple requests. Her income and expense declaration stated she held $150,000 in cash, but she testified at the hearing she only had $700. The court concluded, "Based upon the insufficient, contradictory, and lack of competent evidence presented by [Esmeralda], the [c]ourt finds [she] has failed to meet her burden of proving her reasonable needs. The [c]ourt finds the needs of the children including special needs and [Esmeralda] will be met by this order." On September 7, 2018, the court issued a support order and statement of findings consistent with the statement of decision.

E.    *Subsequent Proceedings*

On July 27, 2018 Ron filed an RFO for modification of child support based on an increase in Ron's custodial timeshare from 17 percent to 50 percent. On August 9 Ron provided Esmeralda with an updated income and expense declaration and a copy of RMI's QuickBooks accounts for the 12-month period ending July 31, 2018. Based on Warsavsky's analysis of the financial

7

data, on September 20, 2018 Esmeralda filed a motion for new trial. After a hearing, on October 29 the family court issued a written ruling denying the motion.[10] Esmeralda timely appealed the support order and the order denying her new trial motion.

## DISCUSSION

A. *Standard of Review*

"The standard of review that applies to an order for temporary spousal support is abuse of discretion." (*In re Marriage of Lim & Carrasco* (2013) 214 Cal.App.4th 768, 773 (*Lim*); accord, *In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327 (*Wittgrove*).) Likewise, "appellate courts review child support awards for an abuse of discretion." (*In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 529 (*Hein*); accord, *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1038.)

"Under this standard, we consider only 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.] 'We do not substitute our own judgment for that of the trial court, but confine ourselves to determining whether any judge could have reasonably made the challenged order.'" (*In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527 (*Macilwaine*); accord, *Hein, supra*, 52 Cal.App.5th at p. 529; *In re Marriage of Smith* (2015) 242 Cal.App.4th 529, 532 [a support

---

[10] On November 16, 2018 the family court granted Ron's RFO and entered a new support order effective August 1, 2018. Accordingly, the temporary support order at issue in this appeal was effective from January 15, 2018 through July 31, 2018.

order "'will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made'"].) "On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. [Citation.] We accept all evidence favorable to the prevailing party as true and discard contrary evidence." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

However, in reviewing a child support order we are "'mindful that "determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule."'" *(In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1312; see *Macilwaine, supra*, 26 Cal.App.5th at p. 527 ["'[T]he trial court's discretion is not so broad that it "may ignore or contravene the purposes of the law regarding . . . child support."'"].) We independently review whether the court "followed established legal principles and correctly interpreted the child support statutes. . . ." (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731.)

B.    *Law Governing Spousal and Child Support*

Under Family Code section 3600,[11] a family court may order temporary spousal support in "any amount that is necessary for the support of the other spouse," as long as the amount is consistent with section 4320 (listing circumstances to

---

[11]    All further undesignated statutory references are to the Family Code.

9

consider in ordering support) and section 4325 (limiting spousal support to a spouse convicted of domestic violence). "The purpose of pendente lite spousal support is to maintain the parties' standards of living in as close as possible to the preseparation status quo, pending trial. In fixing temporary spousal support, trial courts are not restricted by any set of statutory guidelines. The amount of the award lies within the trial court's sound discretion, and is reversible only on a showing of clear abuse of discretion." (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 103-104; accord, *In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 29 [An award of temporary spousal support "is based on the supported spouse's needs and the other spouse's ability to pay."]; *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 594 ["Awards of temporary spousal support . . . may be ordered in 'any amount' [citation] subject only to the moving party's needs and the other party's ability to pay."].) "'[I]n exercising its broad discretion, the court may properly consider the "big picture" concerning the parties' assets and income available for support in light of the marriage standard of living.'" (*Lim, supra*, 214 Cal.App.4th at p. 773; accord, *Wittgrove, supra*, 120 Cal.App.4th at p. 1322.)

Child support payments, by contrast, are prescribed by statutory guidelines set forth in section 4050 et seq. "[A]dherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 284.) Section 4055 sets forth a mathematical formula for computing the guideline amount of child support based on the relative income of the parents and their time-sharing arrangement for physical custody of the children. This

10

calculation is incorporated into the DissoMaster program to generate child support guidelines. (*In re Marriage of Olson, supra*, 14 Cal.App.4th at p. 5, fn. 3.) "The mandatory formula for calculating child support takes into account both parents' 'net monthly disposable income' [citations], which is determined based upon the parents' 'annual gross income.'" (*In re Marriage of Alter, supra*, 171 Cal.App.4th at p. 731.) "Parental income is 'broadly defined' for the purpose of calculating child support under the statutory guidelines." (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1237.) Section 4058, subdivision (a)(2), defines "annual gross income" as "income from whatever source derived," including, without limitation, salaries and wages, investment income, and "[i]ncome from the proprietorship of a business, such as gross receipts from the business reduced by expenditures required for the operation of the business."

Moreover, a court making a temporary support order must base its determination of a spouse's income on a "fair and representative" time sample that reflects the spouse's true income. (*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1081 (*Riddle*) [family court abused its discretion by computing temporary child and spousal support based on testimony of husband's expert as to cashflow over a two-month period instead of a 12-month sample].) "If the monthly net disposable income figure does not accurately reflect the actual or prospective earnings of the parties at the time the determination of support is made, the court may adjust the amount appropriately." (§ 4060; accord, *Riddle*, at p. 1081; see *County of Placer v. Andrade* (1997) 55 Cal.App.4th 1393, 1396 ["The assumption underlying these calculations is that past income is a good measure of the future income from which the parent must pay

11

support.  However, the law recognizes that is not always the case."].)

C.    *Substantial Evidence Supports the Family Court's Determination of Spousal and Child Support*

Esmeralda contends (1) the family court erred in finding RMI's net operating income would decrease in 2018 based on a reduction in Ron's work schedule; (2) the court erred in reducing the income Ron had available for support by $354,000 to replenish RMI's cash reserves; (3) Ron's meal and entertainment expenses were perquisites that should have been added to his income; and (4) the court should not have reduced Ron's income available for support based on RMI's expenditures of $38,940 on equipment in 2017.  The family court did not abuse its discretion because substantial evidence supports the court's findings.

1.    *RMI's projected 2018 net operating income*

a.    Evidence and court findings

Ron testified he performed approximately 15,000 procedures in 2017, including eye injections, lasers, and surgical procedures; the other four physicians affiliated with RMI collectively performed 2,500 procedures.  Ron's caseload in 2017 was double his caseload a few years earlier, when he treated approximately 25 to 40 patients per day.  On several occasions in 2017, Ron tried to reduce his caseload and told Esmeralda he could not sustain the volume of patients.  Ron testified the high patient volume was hurting the quality of his life and family and impacting the quality of patient care:  "When you are seeing 150 patients a day, you have to keep the eye correct, you have to hold [the patient's] hand, you have to make sure they understand

12

what they are going thorough, why they are going through the procedure. If you don't, you are going to open yourself up to liability with lawsuits and you are also not taking full care of the patient." Ron asserted Esmeralda opposed his efforts in 2017 to reduce his caseload because she wanted to maximize RMI's income.

After the parties' separation in January 2018, Ron worked with his staff to reconfigure the patient scheduling template so his staff could schedule him for no more than 10 procedures per hour. Although Ron made the change in January 2018, it did not take effect for a few months. Ron also hired another physician, Michael Heeg, and increased the hours of the other RMI physicians. Dr. Heeg began working at RMI on April 25, 2018, the day the hearing commenced. At the time of the hearing, the existing physicians were performing 160 more procedures per week than 2017 levels, and Dr. Heeg was scheduled to work three days per week and to perform 50 procedures a day.

Hughes prepared a 2018 budget for RMI.[12] He testified RMI's expenses were projected to increase by $126,722 per month over the 2017 monthly average as a result of the hiring of Dr. Heeg's, increased payment to the other RMI physicians for their added caseload, and other costs related to hiring and staffing changes. Hughes testified there would be no increase in 2018 revenue, however, because RMI would see the same total

---

[12] Esmeralda contends the family court abused its discretion in overruling her objection to admission of Hughes's 2018 RMI budget and his 2018 budget projections. The family court did not abuse its discretion because Hughes provided a foundation for his testimony, explaining how the changes that had been implemented affected RMI's projected revenues.

number of patients in 2018 as it did in 2017 due to changes in the work flow and the physicians' changed work levels.

In its statement of decision, the family court found, "[T]he evidence supports [Ron's] testimony that he can no longer maintain seeing approximately 150 patients a day and has taken steps to reduce his volume to 60 to 70 patients a day. Costs for RMI have increased because [Ron] has altered his business practices by increasing the hours of the other physicians as well by the hiring of a new physician. The testimony of RMI's accountant, Tim Hughes, established to the satisfaction of the [c]ourt that the increased cost to the practice for the additional physicians' hours and the increased staff needed to support them, will decrease RMI's operating income in 2018 by $110,058 per month."[13]

> b. Substantial evidence supports the family court's finding RMI's net operating income would decrease in 2018 because of Ron's reduced workload

Esmeralda contends there was not substantial evidence that Ron decreased his caseload by the time of the April 2018 hearing, pointing to inconsistencies in Ron's testimony as to the number of procedures he performed in 2017 and 2018.

---

[13] The statement of decision does not explain why the family court found RMI's monthly expenses increased by $110,058 instead of the $126,722 amount in Hughes's projected budget. On appeal, Ron asserts the court did not include recruitment fees paid to hire Dr. Heeg as an expense.

14

Substantial evidence supports the family court's finding Ron had taken steps to significantly reduce his patient volume in 2018.

Ron testified that in 2017 he had been seeing 150 patients in a day, which was unsustainable, so he reduced the number of procedures he would perform in 2018 to 10 procedures per hour. He also testified on cross-examination, as Esmeralda points out, he was averaging 30 to 50 procedures per day as of April 2018. Ron did not explain whether this amount was averaged over the year or a daily number (that is, working only three to five hours in a day). Esmeralda points to Ron's testimony during direct examination in which he stated in 2017 he averaged 30 to 50 procedures a day, without explaining the difference between his two estimates (150 or 30 to 50 procedures per day).

No doubt there are inconsistencies in Ron's testimony. It is unclear what the basis was for Ron's testimony he "averaged" 30 to 50 procedures in a day in 2017, but his testimony he performed approximately 15,000 procedures in 2017 would have required him to perform a significantly higher number of daily procedures. For example, if he performed procedures on 200 days in 2017 (assuming approximately four days a week for 48 weeks), he would have performed 75 procedures in a day. Further, Ron testified his patient load had doubled by 2017, from a prior patient load of 25 to 40 patients per day. Based on Ron's testimony he reduced the number of daily procedures he performed in 2017 from 150 per day to 10 procedures per hour (also described as 30 to 50 procedures per day), substantial evidence supported the family court's finding Ron had reduced his daily volume to no more than 60 or 70 patients a day (impliedly assuming Ron worked six- to seven-hour days). The fact Ron may have decreased his workload even further to 30 to

50 procedures a day does not support Esmeralda's position. Further, the family court's failure to rely on Ron's inconsistent testimony he only performed 30 to 50 procedures on average each day in 2017 was not an abuse of discretion because we "accept all evidence favorable to the prevailing party as true and discard contrary evidence." (*In re Marriage of Drake, supra*, 53 Cal.App.4th at p. 1151.)

The family court was also correct as a matter of law that Ron was not required to maintain an unreasonable work regimen or have income imputed to him based on an unreasonable work regimen. (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 236 [support order should be based on income from an "objectively reasonable work regimen" and a "regimen requiring excessive hours or continuous, substantial overtime . . . generally should be considered extraordinary"].)

Esmeralda also points to Ron's testimony the other physicians increased the number of procedures they performed in 2018, which she argues would have increased RMI's net operating income. But Hughes testified such changes in the workflow and the physicians' relative work levels would not increase the aggregate number of patients treated by RMI or increase its revenues.[14] Moreover, Esmeralda does not dispute

---

[14] The weekly increase in procedures by the other RMI physicians totaled approximately 310 procedures (150 for Dr. Heeg and 160 for the other physicians). Ron's testimony he reduced his number of procedures from 150 in a day to 70 or 80 (the court's calculation assuming seven- to eight-hour days) would have reduced his weekly procedures (assuming four-day weeks) by 290 to 320 procedures. If Ron reduced his daily

16

that Ron's salary did not change despite his reduced caseload, nor does she dispute RMI had to pay Dr. Heeg's salary and pay the other physicians more for their additional procedures.[15]

Esmeralda also points to evidence in RMI's 2018 budget that the practice was increasing its expenditures on Eylea, an injectable drug for macular degeneration, by approximately $90,000 per month (equivalent to 45 doses), but the budget did not reflect an offsetting reduction in RMI's purchases of alternative drugs. From this fact, Esmeralda concludes, "RMI therefore must have been projecting an increase not only in Eylea injections, but in overall procedures—with use of the alternative projects remaining constant." (Italics omitted.) Esmeralda's assertion is speculative given the absence of testimony regarding RMI's purchasing practices and whether it had shifted to Eylea from its use of other drugs for injections.

Because there was substantial evidence RMI's projected net operating income would decrease in 2018 due to the additional personnel costs resulting from Ron's reduction in patient load,

---

procedures even further (for example, to 30 to 50 procedures per day), this reduction would have been even greater.

[15] Esmeralda takes exception to the inclusion in Hughes's budget of expenses of $2,333 per month for recruitment and $1,600 per month in credentialing costs for Dr. Heeg, which she claims were one-time costs. But Hughes testified the recruitment fee was $28,000, which averaged $2,333 per month prorated across 2018. There was no evidence whether the credentialing fee was recurring. Regardless, as noted, the family court recognized only $110,058 of the $126,722 of RMI expenses included in Hughes's 2018 budget as a reduction against Ron's income available for support.

the court did not abuse its discretion in reducing Ron's business income available for support by $110,058.[16]

### 2. *RMI's cash reserves*

#### a. Evidence and court findings

In her pretrial deposition and declarations, Esmeralda admitted she withdrew $340,000 from RMI's bank account in November and December 2017, which she transferred into "a new account Ron did not know about." Esmeralda withdrew an additional $50,000 on January 8, 2018 to pay her lawyer's retainer fee.

In the experts' joint report, Ron claimed $354,000 should be deducted from the RMI net income available for support to replenish the company's cash reserves. According to Decker, the cash balance in RMI's bank accounts in December 2017 was only $16,386, significantly below RMI's historical reserves and below

---

[16] Esmeralda's reliance on *Philbin v. Philbin* (1971) 19 Cal. App.3d 115, for the proposition a support award premised on projected contingent future changes in income is improper, is misplaced. In *Philbin*, the Court of Appeal concluded the family court properly entered an order reducing the husband's support obligation after his earnings in the entertainment industry decreased, but the court had abused its discretion by ordering the husband's support obligation automatically to increase after six months even though the husband testified he had no future job offers and worked in a depressed industry, finding the order was based "on the grossest kind of speculation." (*Id*. at pp. 121-122.) Here, the family court's order was based on changes Ron had implemented in his patient load by the time of the April 2018 hearing and the experts' calculation of the impact of those changes on RMI's net operating income.

18

the cash reserves of similarly sized medical practices, placing RMI at risk of being unable to meet its obligations. By comparison, the average month-end balances in RMI's bank accounts in 2015 and 2016 had been $550,438.

Ron and Hughes testified RMI was unable to make payroll in the first half of January 2018 because of the depleted cash reserves, and Ron forwent his biweekly salary so staff could be paid. Ron took an equity draw of $13,000 in January 2018, in contrast to his taking a $150,000 draw in both February and March.

Warsavsky opined RMI generated sufficient cash from its operations that it was not necessary to divert additional funds into cash reserves. RMI received payments for services in 2018 totaling about $600,000 in January; between $500,000 and $600,000 in February; and $1 million in March.

The family court found RMI's cash reserves were "well below the historical level of cash of month end balances in its bank account during 2015, and 2016 of $550,438," and it adopted Ron's position the cash reserves should be replenished "to maintain sufficient operating capital." The court found $354,000 ($29,500 per month) should be deducted from the RMI net operating income available for support.

> b. Substantial evidence supports the family court's finding RMI needed to replenish its cash reserves

Esmeralda contends Ron's one-month "snapshot" of RMI's cash position in December 2017, which she asserts is a month in which businesses pay off their bills to defer income for tax planning purposes, did not provide substantial evidence RMI's

19

cash reserves needed to be replenished. She also argues Ron's evidence that RMI's month-end balances averaged $550,438 over a two-year period omitted evidence of monthly fluctuations and was "not a reflection of the typical year-end balance," citing to *Riddle, supra*, 125 Cal.App.4th at page 1081.

It is Esmeralda's contentions that are speculative. It is undisputed Esmeralda withdrew $350,000 from RMI's bank accounts in late 2017, and there is substantial evidence that, as a result, RMI's cash balance was so low at the end of December that Ron forwent his salary and took a reduced draw in January 2018 so RMI could pay its other employees. In addition, although Esmeralda is correct there is no evidence of the variations in historical month-end reserves, RMI's December 2017 cash balance significantly deviated from the historical average of $550,438. Warsavsky's testimony RMI received $600,000 to $1 million in monthly gross revenue in the early months of 2018 is not to the contrary because it ignores RMI's monthly expenses and outlays.[17]

3. *Meals and entertainment expenses*

a. Evidence and court findings

In the experts' joint report, Esmeralda claimed $78,373 of meal and entertainment expenses that were charged to RMI's American Express credit card in 2017 were perquisites that

---

[17] Esmeralda's contention the family court erred by recognizing an ongoing monthly reduction of $29,500 although the cash reserves would be replenished within 12 months is moot because the support award was only effective through July 31, 2018.

20

should be counted towards Ron's income available for support. Warsavsky stated "99% of the meals and entertainment expense represent payments to American Express and include charges for sporting events, amusement parks, movies, and at a minimum, weekly restaurants charges. Based on discussions with Esmeralda Gallemore, there were no business purpose for meals and entertainment. As a result, 100% of meals and entertainment expense has been included as perquisite . . . ."

Warsavsky testified he and his staff spoke with Esmeralda about Ron's expenses on at least four or five occasions, and Esmeralda told them what the charges were for. Warsavsky also examined "the detail transaction by transaction of 10 pages charged to the American Express bills and they were virtually all for small expenses that appeared to be personal in nature." The credit card statements he relied on provided the "date of the transaction and the amount and the location, but not specifically the business purpose or the individual who was at the event."

Decker stated in the joint report, "[Ron] has indicated that all of the items that were included in the [m]eals and [e]ntertainment expense are business related. . . . I have selected specific [Amerian Express] charges in the [m]eals and [e]ntertainment expense to test. Based on the information provided for [Ron] on these specific [American Express] charges[,] the amounts included in the [m]eals & [e]ntertainment expense appear to be business related." At the hearing, Decker explained he "selected several different charges that were meals and entertainment and asked Ron were these personal or business, and the information that I got back indicated . . . specifics about them that indicated they were business-related for the ones I selected for testing." Decker also consulted with RMI's

21

accountants Hughes and Calvin Chou to determine the nature of the charges.

The family court declined to treat Ron's meals and entertainment expenses as perquisites, explaining Esmeralda's "accountant relied on discussions with [Esmeralda], whereas [Ron's] accountant selected specific charges to test and, based on information provided by [Ron] regarding those specific charges, determined that the amount of the meals and entertainment expense appeared to be business related."

           b.      Substantial evidence supports the family court's finding Ron's meal and entertainment expenses were not perquisites

The experts presented contradictory testimony about the nature of Ron's meal and entertainment expenses on his corporate credit card. But as the family court found, Decker requested further information from Ron and the RMI accountants, tested the individual charges, and found them to be bona fide business expenses. By contrast, Warsavsky relied in significant part on Esmeralda's characterization of the charges, and the court found Esmeralda was not credible in her own testimony, exhibiting evasion and "selective recall as to business operations." In light of the family court's credibility findings, to which we defer, substantial evidence supports the court's finding Ron's expenses were not perquisites. (See *Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 578-579 ["Essentially, the issue is the credibility of the parties; and as to that matter we must defer to the trial judge."].)

22

4. *Equipment purchases*

a. Evidence and court findings

In the experts' joint report, Decker asserted the family court should deduct $82,184 from Ron's income available for support to cover RMI's depreciation expenses in 2017. Decker requested in the alternative, "[I]f depreciation expense is not included then the purchases of depreciable assets that were made during the year should be deducted. During 2017, [RMI] purchased $48,950 of depreciable assets." Warsavsky responded that depreciation expenses are non-cash expenses that should not be included in operating expenses for a service-oriented business that has no cost of sales and no inventory. Warsavsky testified, "Consequently, the need to replace machinery and equipment for a temporary support order should be excluded [from income] in this case in order to preserve the status quo of [Esmeralda]."

The family court agreed with Warsavsky and declined to deduct $82,184 in depreciation expenses. However, the court adopted Ron's alternative position and found "the $38,940 paid for assets in 2017 . . . was an actual cash outlay of RMI to replace equipment in order to maintain the operations of the business, and is therefore properly deducted from income for purposes of support."

b. Esmeralda has forfeited any challenge to the family court's deduction of $38,940 for RMI's 2017 equipment expenditure

Esmeralda contends the "purchase of a long-term or noncurrent asset is not an 'expense' . . . because such a transaction is a redistribution of assets, i.e., a transfer of a current asset such as cash in exchange for a fixed asset such as

23

equipment," and accordingly it was improper for the family court to treat RMI's 2017 equipment purchases as an RMI expense to reduce Ron's income available for support. (Italics omitted.) However, Esmeralda did not make this argument below, and Warsavsky did not claim RMI's 2017 expenditures on equipment could not be deducted as an expense. Moreover, in her detailed objections to the family court's proposed statement of decision, Esmeralda did not object to the family court's finding on this issue.

Although Ron asserted his alternative argument on depreciation in his written closing argument, Esmeralda made a strategic decision not to address Ron's fallback position in her written closing argument or her objections to the family court's proposed order. As a consequence, the hearing record contains no evidence about the nature of the 2017 expenses and whether the purchases were for "long-term or noncurrent assets" that should be treated as an income-neutral investment, as Esmeralda now contends.

Under these circumstances, Esmeralda has forfeited her argument RMI's 2017 equipment expenditures should not be deducted. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 ["issues not raised in the trial court cannot be raised for the first time on appeal"]; *Hanna v. Mercedes–Benz USA, LLC* (2019) 36 Cal.App.5th 493, 513 ["""As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal . . . ."""].) """This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal . . . .""" (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789; accord, *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th

24

1483, 1492 ["opposing party should not be required to defend for the first time on appeal against a new theory"].)

D.    *The Family Court Did Not Abuse Its Discretion in Denying Esmeralda's New Trial Motion*

1.    *Factual and procedural history*

On August 9, 2018 Warsavsky obtained a copy of RMI's QuickBooks file containing RMI's financial information through July 31, 2018. Based on this information, Warsavsky prepared a profit and loss statement for the 12-month period through July 2018. He also created a profit and loss statement for the period January 1 through July 31, 2018, and he compared that data to the same seven-month period in 2017. Warsavsky found RMI's physician expenses totaled $809,938 in the first seven months of 2018, compared to $708,220 in the same period in 2017. RMI's total income over this period increased by $437,351.84, and its total expenses decreased by $72,268.86. Net income accordingly rose by $153,337.45, or 9.19 percent over the previous year. Net operating income increased by $255,056.14, or 10.74 percent. Warsavsky also determined RMI had the following cash balances in its bank accounts: $112,926 in January 2018; $217,543 in February 2018; $447,669 in March 2018; $306,321 in April 2018; $406,845 in May 2018; $389,726 in June 2018; and $436,473 in July 2018.

Esmeralda moved for a new trial based on this evidence (and other grounds not at issue on appeal). Relying on Warsavsky's declaration, Esmeralda argued the new information showed that contrary to Hughes' projections, RMI's income had increased over the first seven months of 2018. Further, although physician expenses increased as Hughes had projected, these

25

increases were more than offset by increased revenue and reduced costs.  Esmeralda also argued the evidence RMI had a cash balance of $447,669 at the end of March 2018 showed no cash infusion was required to replenish RMI's reserves.

The family court denied Esmeralda's new trial motion, explaining, "The newly discovered evidence reflects circumstances that occurred *after* trial, and is therefore immaterial to the Court's determination at trial."  The court did not reach whether the evidence was newly discovered or whether Esmeralda exercised reasonable diligence in obtaining it.

2. *Standard of review and applicable law*

"The denial of a new trial motion is reviewed for an abuse of discretion, except that a trial court's factual determinations are reviewed under the substantial evidence test."  (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7; see *People v. Johnson* (2019) 8 Cal.5th 475, 524 ["We will not disturb a trial court's denial of a motion for a new trial unless 'a "manifest and unmistakable abuse of discretion"' clearly appears."].)

"The trial court may grant a new trial based on newly discovered evidence if the moving party shows the evidence is newly discovered, reasonable diligence was used to find it, and the new evidence is material to the moving party's case." (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 727-728 (*Santillan*); Code Civ. Proc., § 657 [court may grant new trial based on "[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial"].)  "Evidence is material when it is likely to produce a

different result." (*Santillan*, at p. 728; *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 779.)

### 3. *Analysis*

Esmeralda contends the court erred in ruling her newly discovered evidence reflected circumstances occurring after trial, arguing the financial data also covered the period from January through April 2018. However, Warsavsky's declaration and the attached data addressed only the aggregate seven-month period from January through July 2018. It was not the family court's role to comb through raw financial data to find information the moving party failed to identify.[18]

Further, Esmeralda failed to show the information about RMI's cash balances at the end of January, February, and March 2018 was not available at the time of the RFO hearing. Esmeralda's trial counsel cross-examined Decker about the cash balances during this period, and Decker testified, "January was the lowest and then it when up a little in February, I believe, and then it did go up significantly. . . . It may have [gone] up a decent chunk, I believe, in March. I can get the specific amounts but

---

[18] Nor does the fact net operating income increased over the seven-month period necessarily undermine Hughes' 2018 projections at the time of the support hearing in April 2018. There was substantial evidence the changes to Ron's caseload did not take full effect for a "few" months after they were implemented in January 2018, and Dr. Heeg did not begin to see patients until the end of April. Conversely, there is evidence it typically took RMI 60 to 90 days to recover payment for services, and thus RMI's income in early 2018 reflected operations in late 2017 when Ron maintained his peak caseload.

would have to grab the documents." Decker's testimony is consistent with the new evidence, and Esmeralda's attorney failed to request Decker retrieve the documents to provide the requested information despite Decker's testimony the information was readily available.[19]  (See *Santillan, supra*, 202 Cal.App.4th at p. 728 [To support a new trial motion, "evidence must be newly discovered after the trial or too late to produce at trial."].)  Although the family court did not address whether the new trial evidence was newly discovered or whether Esmeralda pursued it diligently,  'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.'" (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12; accord, *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1516.)

Because Esmeralda failed to present evidence that was relevant to the support award that she could not have discovered earlier, the court did not abuse its discretion in denying her new trial motion.

---

[19]    The data concerning the month-end cash balances in January through March 2018 all show a balance significantly below the two-year historical cash balance of $550,438.  Even in July 2018 the cash balance had only grown back to $436,473.  The newly discovered evidence is consistent with the family court's order on the cash reserves and undermines Esmeralda's argument that Decker's December 2017 cash balance "snapshot" and the undifferentiated two-year average were not a sufficiently "fair and representative" sample to show RMI's true cash reserves.  (*Riddle, supra*, 125 Cal.App.4th at p. 1081.)

28

## DISPOSITION

The family court's September 7, 2018 order for pendente lite spousal and child support and the October 29, 2018 order denying Esmeralda's new trial motion are affirmed. Ron is to recover his costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.