Filed 11/23/21  Marriage of Rubanowitz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re the Marriage of BARBRA and SHALOM RUBANOWITZ. | B301941 (Los Angeles County Super. Ct. No. BD574834) |
| BARBRA RUBANOWITZ, Plaintiff and Respondent, v. SHALOM RUBANOWITZ, Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott M. Gordon, Judge.  Affirmed.

Melvin Teitelbaum for Appellant.

James Alex Karagianides for Respondent.

————————————

Shalom Rubanowitz appeals from the judgment entered following a marital dissolution trial awarding child and spousal support to his former wife, Barbra Rubanowitz, and denying his request for attorneys' fees.[1] Shalom contends the family court erred by not considering monetary payments that Barbra's father made to Barbra or to third parties on her behalf as income to Barbra when calculating child and spousal support. Further, Shalom argues he was prejudiced by the denial of his request for a trial continuance to allow him to call Barbra's vocational evaluator as a witness. Shalom also asserts the family court abused its discretion in denying his request for attorneys' fees under Family Code section 2030.[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Marital Dissolution Proceeding*

Barbra and Shalom were married in 1991 and separated on September 24, 2012. Barbra filed a petition for marital dissolution on December 10, 2012, and a status-only judgment of dissolution was entered on November 19, 2015. Barbra and Shalom have seven children, six of whom were minors when the dissolution proceeding began.

Shalom is a rabbi and an attorney who practices as a sole practitioner. Shalom's revenues from his law practice dropped in 2011 when he lost a major client. In 2012, after Barbra and Shalom separated, Shalom lost the bulk of his legal business because he no longer represented the business interests of

---

[1]    We refer to the parties by their first names to avoid confusion.

[2]    Further statutory references are to the Family Code.

2

Barbra's family.  Barbra is a stay-at-home mother who did some part-time work as a doula for a short period of time.  After their separation, Shalom did not provide child or spousal support to Barbra.

B.    *The Pretrial Orders and Barbra's Appeal*

In January 2013 Barbra filed a request for pendente lite child and spousal support.  Following a two-day hearing, on May 29, 2014 the family court[3] issued a written order on the parties' requests for pendente lite child and spousal support and attorneys' fees.  The court found payments made by Barbra's father, William Moskovits, to Barbra or to vendors on her behalf were regular and recuring cash gifts that should be treated as income to Barbra when calculating child and spousal support.  The court found Barbra's gross income available for support was $30,000 per month based on Moskovits's payments of at least $57,000 per month.  The court found the child support guidelines provided for payment by Shalom to Barbra of $424 per month as child support for their five minor children (one by then was an adult) based on gross income of $11,098 per month for Shalom and $30,000 per month for Barbra.  But the court deviated upward from the guideline amount and ordered Shalom to pay $1,500 per month in child support because Shalom was spending generously on himself, and the court found the money would be better spent on the children.  The court also found the spousal support guidelines provided for Barbra to pay Shalom $5,791 per month as pendente lite spousal support, but the court did not order payment of spousal support, finding Moskovits would reduce his payments to Barbra if they were used to pay spousal

---

[3]    Judge Bruce G. Iwasaki.

support to Shalom, which would be detrimental to the children. The court found it was in the children's best interest that neither party pay the other pendente lite spousal support. Finally, the court ordered Barbra to pay Shalom's counsel $140,000 in attorneys' fees and costs under section 2030 because there was a substantial disparity in access to funds to pay for an attorney, Shalom's request for attorneys' fees was reasonable, and Barbra had the ability to pay Shalom's attorneys' fees. Barbra appealed from the orders.

On June 7, 2016 we reversed the family court's orders for pendente lite child support, spousal support, and attorneys' fees. (*In re Marriage of Rubanowitz* (June 7, 2016, B257782) [nonpub. opn.] (*Rubanowitz I*).) We concluded the family court abused its discretion in determining Moskovits's payments to Barbra and to third party vendors were income to Barbra for purposes of pendente lite child and spousal support. Although Moskovits made regular payments in fixed amounts for some expenses, such as private school tuition for the children, Moskovits's payments to Barbra and other third parties "were sporadic in nature, varied in amount, and depended on what particular expenses were incurred in a given month." (*Ibid*.) Moskovits's payments therefore were outside "'the traditional concept of income as a recurrent monetary benefit,'" as described by *In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 736 (*Alter*). (*Rubanowitz I*, B257782.) Further, the family court abused its discretion by arbitrarily estimating $30,000 per month as gross income attributable to Barbra based on Moskovits's monthly $57,000 payments. We also concluded the "[family] court's order that Barbra pay $140,000 in attorney's fees and costs to Shalom's counsel exceeded the amount reasonably necessary for Shalom to maintain the dissolution action during the pendency of the

4

proceeding." (*Ibid*.) We instructed the family court to "reconsider the role of the payments made by Moskovits as part of its review of the statutory factors" delineated by sections 2030 and 2032 given that Moskovits's payments to Barbra "were not regular and recurring." (*Ibid*.) We stated, "On remand, the trial court shall consider its redetermination of Barbra's income and the balance of funds remaining in the client trust account held by Shalom's counsel, as well as the attorney's fees and costs likely to be incurred by Shalom through trial, in deciding whether to order an award of attorney's fees and costs to Shalom under section 2030, and if so, the amount of such award." (*Ibid*.)

C.    *The Evidence at Trial*

A six-day trial was held in March 2019. At the time of trial, Barbra and Shalom had three minor children: 17-year-old Shlomo, 14-year-old Avigayil, and 10-year-old Batsheva.

Shalom testified he has been a licensed attorney since 1995. He worked "somewhere between 15 and 20 hours" per week for the prior three years and charged clients between $100 and $350 per hour. In addition, Shalom worked a minimum of 38 hours per week as a rabbi at the Pacific Jewish Center. The Pacific Jewish Center paid Shalom a starting salary of $4,000 per month (increased to $5,000 per month in November 2017), his housing cost of $4,800 per month (paid directly to the landlord), and $5,000 per year for leading services during the high holidays.

Shalom testified that during the marriage, Barbra's grandfather Mark Kornwasser paid for Shalom and Barbra's household expenses, their children's private school tuition, food, clothes, vacation, and health-related expenses. After Kornwasser's death in approximately 2010, Moskovits "agreed to

5

pay everything the grandparents paid."[4]  During the marriage, Shalom's law practice "was split between doing work for Barbra's family and working in the mortgage banking industry."  After Barbra and Shalom separated, Shalom's work with Kornwasser's real estate business "dwindled drastically" and "was gone within a year or so after separation."

Barbra testified that during the marriage she did not work outside the home except for some work as a doula because she was the primary caregiver for her and Shalom's seven children.  At the time of trial, Shlomo primarily resided with Shalom and visited Barbra twice a week for four hours each visit.  Avigayil and Batsheva primarily resided with Barbra.

Moskovits testified that prior to Barbra and Shalom's separation he did not pay for their expenses except for the children's private school tuition and summer camp fees.  After Barbra and Shalom's separation, Shalom paid $1,500 per month in child support from 2015 to July 2017.  Moskovits testified he "had to step in and pay" Barbra's expenses because "Shalom wasn't paying any of the bills."  Barbra relied on Moskovits to pay her monthly expenses, which averaged $17,825 per month.  Moskovits paid Avigayil's and Batsheva's tuition directly to their school.  Shalom paid for Shlomo's private school tuition for the prior two years because Moskovits did not approve of the school.

Barbra testified Moskovits did not give her a set amount of money.  Moskovits initially made payments directly to vendors and service providers.  Later, she "would present him with [an] Excel spreadsheet, and he would look at all the expenses and give

---

[4]  Moskovits denied this conversation occurred.  Further, Moskovits testified Kornwasser only paid for the children's private school tuition prior to Kornwasser's death in 2011.

6

[her] a check for that month's expenses." Moskovits similarly testified he initially wrote checks directly to the vendors. Beginning in February 2013, Moskovits wrote checks to Barbra to ensure she had enough money to cover her and the children's expenses for the next month. Once a month, Moskovits and Barbra would review Barbra's credit card bills and bank statements on a spreadsheet, and Moskovits would pay the total of the bills. Moskovits recorded his payments to Barbra, her attorneys, and vendors on spreadsheets, which were admitted into evidence. The spreadsheets included the dates and amounts of the payments and payees covering the period from November 2011 to February 2019.

Barbra and Moskovits testified Moskovits's payments to her and others on her behalf were loans. Barbra signed promissory notes prepared by Moskovits reflecting his payments to her from February 4, 2014 to February 26, 2019, which totaled more than $7 million. The last four promissory notes executed on August 30, 2018 reflected the accrued amount Barbra owed Moskovits. The promissory notes either stated the loan was without interest or did not state an interest rate. Further, the promissory notes did not have a due date or were due within 30 days after Moskovits' written notice of demand to Barbra. Moskovits testified Barbra repaid him $50,000 or $100,000 from the proceeds Barbra received from the sale of her and Shalom's house. Moskovits expected Barbra to repay the promissory notes from the child support arrears and Barbra's wages once she could work after her minor children became adults. Barbra testified she intended to pay Moskovitz back by going to work when her youngest child Batsheva entered high school.

Tracy Katz, Barbra's accounting expert, testified she prepared cash flow analysis and community property balance

sheet analysis to calculate the appropriate amount of child and spousal support that should have been paid during the period from 2013 through 2018. Katz calculated Shalom's average cash flow was $244,870 per year ($20,406 per month). Katz did not prepare a cash flow analysis for Barbra because Barbra was not employed.

Ron J. Anfuso, Shalom's accounting expert, testified he prepared cash flow reports for Shalom and Barbra based on information for the two-year period ending December 31, 2018. Anfuso calculated Shalom's income from his law practice and employment with Pacific Jewish Center was $9,651 per month. Anfuso imputed income of $3,389 per month to Barbra based on "an average of three different job categories as opined by [Barbra's] vocational evaluator," which "were social service case work at approximately $40,000 a year, program coordinator at approximately [$]41,000 and licensed vocation[al] nurse at [$]41,000." Further, Anfuso attributed income of $208,612 per month to Barbra from the funds she received from Moskovits, which was approximately $5 million over the two-year period. Anfuso opined Moskovits's payments should be attributed as income to Barbra because they were recurring gifts under *Alter*. But Anfuso admitted Moskovits's monthly payments varied "based on the expense reports provided by [Barbra] to her father." Based on these income calculations, Anfuso calculated Barbra owed Shalom $37,749 per month in child support for the three children who were still minors.

Towards the end of trial, Shalom's attorney indicated he intended to call Susan Miller, who had conducted a vocational

examination of Barbra pursuant to a court order.[5] Shalom's attorney asked for a trial continuance because Miller was in San Francisco. Shalom's attorney admitted he did not subpoena Miller, but he had paid her witness fees. Subsequently, Shalom's attorney informed the court Miller was at a conference. The family court denied the request for a trial continuance, stating, "[T]o delay a trial because she is at a conference isn't good cause." To avoid delay of the trial, Barbra's attorney offered to stipulate to the admission of Miller's report and to waive the right to cross-examine Miller. Shalom's attorney responded, "I'll accept that." The family court admitted Miller's vocational examination report, noting the parties stipulated to its admission.

In the vocational examination report, Miller stated, "[Barbra] will need to prepare for work before applying for paid positions. Specifically, she will need to become computer proficient using the programs contained in Microsoft Office. [¶] In addition, [Barbra] needs to gain current relevant experience. She could volunteer three to four days a week, for three to four hours per day, over a six-month period at a Jewish nonprofit organization or an organization that helps children with cancer. [¶] After becoming computer proficient and gaining focused, relevant, experience as a volunteer, she will be qualified to work as a intake or social service aide, or program coordinator, particularly in a Jewish nonprofit agency or an organization that helps children with cancer. [¶] . . . [¶] My research indicates that the projected 2019 beginning annual earnings of

---

[5]     On January 7, 2019 the family court granted Shalom's request for a vocational examination of Barbra and ordered that Barbra "shall bear the costs of her vocational examination and the associated written report."

9

intake/social service case workers in Los Angeles are approximately $40,000. Program Coordinators at nonprofit organizations in Los Angeles are projected to have beginning annual earnings in 2019 of approximately $41,000. [¶] For the longer term future, [Barbra] may be interested in becoming a licensed vocational nurse. In this position, she could work as a labor and delivery, or post partum nurse."

D.    *Shalom's Request for Attorneys' Fees*

On May 13, 2019 Shalom filed a posttrial brief requesting attorneys' fees and costs.[6] Shalom contended he was entitled to an award of attorneys' fees and costs under section 2030 because there was a disparity in access to funds to retain counsel and Barbra was able to pay for her and Shalom's legal representation. Shalom requested the family court order Barbra to pay for attorneys' fees and costs Shalom incurred during the pendency of the dissolution action, including $49,000 to his prior attorney Stephen Landau; $620,000 to his prior law firm Shuchman and Kaplan; $144,454 to appellate attorney Ed Horowitz; $11,500 in costs awarded to Barbra in the prior appeal; $439,400 to his current attorney Melvin Teitelbaum for attorneys' fees incurred through March 2018, plus $152,587 in trial preparation costs Teitelbaum had incurred since that time; $100,000 to reimburse Shalom for payments he made to his attorneys and prior forensic accounting expert; and $24,857 to pay for the judgment obtained against Shalom by his prior accounting expert, White Zuckerman. Shalom requested the court also award him

---

[6]    Barbra separately filed a brief requesting $800,000 as sanctions against Shalom under section 271 for Shalom's and his attorney's litigation misconduct.

$900,000, the amount Barbra paid to her divorce advisor Mark Rosenberg, as a sanction under section 271 because "the sole objective of the services" was to litigate and not settle.

In support of his motion, Shalom submitted a four-page billing statement from Teitelbaum for the period from March 2018 to May 2019. The billing statement generally summarized blocks of hours (without time frames), for example, claiming 18 hours of work for a total of $9,000 with the entry: "Write Trial Brief, Supplmntl Trial Brief and Statement of Positions and review PET Trial brief and Statement of Positions." Another entry listed 13 dates and requested payment for "4 hr per appearance . . . @ 500 per hour . . . ." The billing statement listed the amount owed to Anfuso ($17,575.50) and for reporter fees ($1,912), although no further documentation was provided. Teitelbaum also submitted a two-page declaration that stated his hourly rate was $400 per hour, with a $500 rate for trial preparation and trial. Teitelbaum explained that the time he incurred (as reflected in the four-page summary) included "time expended to combat the deceptive enforcement [Barbra] filed with [the Los Angeles County Child Support Services Department] claiming [Shalom] was in violation of an existing support order." Teitelbaum also declared he billed for time expended to obtain entry of an order nunc pro tunc to reverse a prior order requiring the parties exchange exhibits by a certain date. Teitelbaum did not provide any additional explanation of his four-page billing record or the attorneys' fees he claimed were incurred by other attorneys. Shalom submitted a declaration setting forth the amount of attorneys' fees he owed his prior attorneys, without further information or explanation of the work performed.

11

E.     *The Ruling and Judgment*

On June 10, 2019 the family court issued a 90-page ruling addressing the issues raised by Barbra and Shalom at trial.  The court observed, "Despite this limited estate and parties with little or no employment income ([Barbra]) and moderate income ([Shalom]), the parties incurred almost $4,000,000 in attorney fees."  The court added, "[M]uch of this challenge results from the clear and very present anger and resentment [Shalom] bears towards [Barbra's] parents and now deceased grandparents."

The family court considered the promissory notes and Barbra's and Moskovits's testimony that Moskovits's payments to Barbra and vendors were loans.  The court found Moskovits's payments were not loans, but instead were "gifts occurring at varying amounts tied to [Barbra's] and the minor children's needs and expenses."  Further, Moskovits's payments were "irregular in both amount and frequency of payment."[7]  The court concluded Moskovits's payments were not income attributable to Barbra for the calculation of child support under section 4058.

Further, the court denied Shalom's request to impute income to Barbra to calculate child support.  The court found Shalom had not met his burden of proof to present evidence that Barbra had the ability and opportunity to work.  But the court ordered Barbra to provide Shalom "with a written list of at least ten different places [Barbra] has applied for employment every month."  The court ordered Shalom to pay Barbra $237,866 in retroactive child support covering the period from February 1,

_____

[7]     The court also apportioned the community property assets, which are not at issue in this appeal.

12

2013 to June 30, 2019 and $3,783 per month in child support beginning January 1, 2019.

Although the family court did not attribute Moskovits's monetary gifts to Barbra as income, the court "considered the impact and access to those funds" in determining spousal support. The court ordered Shalom to pay Barbra $1,000 per month in spousal support, retroactive to February 1, 2013, until the death of either Barbra or Shalom, Barbra's remarriage, or further order of the court. The court also ordered Shalom to pay Barbra $77,000 in spousal support arrears for the period from February 1, 2013 to June 30, 2019.

The family court denied Shalom's request for attorneys' fees and costs. The court observed that although Moskovits's payments to or on behalf of Barbra were not income for purposes of child and spousal support, "[t]he Court can consider the payment of attorney fees by a third party in balancing the evidence in a request for attorney fees." But the court explained Shalom did not meet the standard set forth in *In re Marriage of Keech* (1999) 75 Cal.App.4th 860 (*Keech*) and California Rules of Court, rule 5.427. Specifically, Shalom provided "no evidence regarding the basis or reasonableness of the legal fees" he requested for Landau, Shuchman and Kaplan, and Horwitz. Further, the court noted Teitelbaum's billing statement from March 2018 to March 2019 was "very summary in nature and does not describe the legal work done other than in bulk hour descriptions." In addition, the court found the billing statement indicated Teitelbaum's total attorneys' fees were $126,500, yet Teitelbaum in his declaration sought $565,900 in attorneys' fees. The court rejected Shalom's request that Barbra pay the $24,857 judgment White Zuckerman obtained against Shalom because

13

Shalom provided no legal authority for the court to order Barbra to satisfy a judgment obtained by a third party against Shalom.

The court added that at trial, Shalom "produced little, if any, evidence to support his requests and demands. The evidence shows that he did not produce necessary current financial information and his testimony was in many instances not credible." Further, Shalom "incurred attorney fees well in excess of the relief requested." The court also observed that Shalom, who himself was a practicing lawyer, "did much to attempt to frustrate this trial." The court explained, "He did not fully cooperate with discovery, never disclosed his 2017 and 2018 business income and answered most substantive financial question[s] in trial with the repeated answers of 'I don't know' and 'I don't recall.' [Shalom's] testimony was not credible and was punctuated with him uttering curses during a break in the trial to [Barbra's] father wishing him a horrible death. [Shalom] declared to the court in pleadings and in trial setting conferences that he needed the court time and resources to call no less than forty witnesses. Other than [Barbra], he called three to testify. He presented only 4 exhibits. Many of the claims that he made and requests for relief were not supported by any evidence or legal authorities."

The court ordered Shalom to pay Barbra $50,000 in attorneys' fees as sanctions pursuant to section 271.[8]

Shalom timely appealed.

---

[8] Shalom does not appeal the $50,000 sanctions award under section 271.

# DISCUSSION

A.  *The Family Court Did Not Abuse Its Discretion in Awarding Child and Spousal Support to Barbra*

   1.  *Law governing child and spousal support*

Statutory guidelines govern the determination of temporary and permanent child support.  (See § 4050 et seq.)  "'The guideline amount of child support, which is calculated by applying a mathematical formula to the relative incomes of the parents, is presumptively correct.  (See §§ 4055, 4057, subd. (a); [citation].)  "The court may depart from the guideline only in 'special circumstances' set forth in the child support statutes.  (§ 4052)."'"  (*Anna M. v. Jeffrey E.* (2017) 7 Cal.App.5th 439, 446 (*Anna M.*); accord, *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 284.)  "'This mandatory formula "takes into account both parents' 'net monthly disposable income' (§ 4055, subds. (a), (b)), which is determined based upon the parents' 'annual gross income' (§ 4058).  Section 4058, subdivision (a), defines 'annual gross income' as 'income from whatever source derived,' and lists more than a dozen possible income sources to be considered as part of annual gross income."'"  (*Anna M.*, at p. 446; accord, *In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1237 ["Parental income is 'broadly defined' for the purpose of calculating child support under the statutory guidelines."].)

"California law provides for two distinct types of spousal support—temporary and permanent.  'Awards of temporary spousal support do not serve the same purpose, nor are they governed by the same procedures, as awards for permanent spousal support.  "Pendente lite allowances and permanent allowances differ fundamentally in nature [citation] and function [citation]."'  [Citation.]  Whereas the latter is intended to make an

15

equitable apportionment between the parties, the former is meant to allow a spouse to continue to live in the manner to which he or she is accustomed during the time the dissolution action is pending." (*In re Marriage of Mendoza & Cuellar* (2017) 14 Cal.App.5th 939, 942-943; accord, *In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 513.)

Under section 3600, a family court may order temporary spousal support in "any amount that is necessary for the support of the other spouse," as long as the amount is consistent with section 4320 (listing circumstances to consider in ordering support) and section 4325 (limiting spousal support to a spouse convicted of domestic violence). "The purpose of pendente lite spousal support is to maintain the parties' standards of living in as close as possible to the preseparation status quo, pending trial. In fixing temporary spousal support, trial courts are not restricted by any set of statutory guidelines." (*In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 103-104 (*Ciprari*); accord, *In re Marriage of Brewster & Clevenger, supra*, 45 Cal.App.5th at pp. 513-514.)

"'Permanent spousal support "is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320." [Citations.] The statutory factors include the supporting spouse's ability to pay; the needs of each spouse based on the marital standard of living; the obligations and assets of each spouse, including separate property; and any other factors pertinent to a just and equitable

16

award.'" (*Ciprari, supra*, 32 Cal.App.5th at p. 108; accord, *In re Marriage of Blazer* (2009) 176 Cal.App.4th 1438, 1442.)

2.      *Standard of review*

We review a child support award for an abuse of discretion. (*In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 529; *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1038.)  We likewise review temporary and permanent spousal support orders for an abuse of discretion.  (See *Ciprari, supra*, 32 Cal.App.5th at p. 104 [explaining as to temporary spousal support, "[t]he amount of the award lies within the trial court's sound discretion, and is reversible only on a showing of clear abuse of discretion"]; *In re Marriage of Lim & Carrasco* (2013) 214 Cal.App.4th 768, 773 [same]; see also *Ciprari*, at p. 108 ["'"In making its [permanent] spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it."'"]; *In re Marriage of Blazer, supra*, 176 Cal.App.4th at pp. 1442-1443 [same].)

"Under this standard, we consider only 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.]  'We do not substitute our own judgment for that of the trial court, but confine ourselves to determining whether any judge could have reasonably made the challenged order.'" (*In re Marriage of Macilwaine* (2018) 26 Cal.App.5th 514, 527; accord, *In re Marriage of Hein, supra*, 52 Cal.App.5th at p. 529; *In re Marriage of Smith* (2015) 242 Cal.App.4th 529, 532 [a support order "'will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made'"].)  "On review for substantial

17

evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.)

        3.     *The family court did not abuse its discretion*

Shalom contends Moskovits's monthly payments to Barbra should be deemed income to her in determining child and spousal support, relying on *Alter, supra*, 171 Cal.App.4th 718.[9]  In *Alter*, the father received $6,000 every month from his mother, including $3,000 to pay for rent, which the family court treated as nontaxable income to the father under section 4058 in calculating child support.  (*Alter, supra*, 171 Cal.App.4th at pp. 730, 737.)  The Court of Appeal concluded the payments were gifts rather than loans because the father's mother had given similar monetary gifts to the couple and their children during the marriage and there was no evidence the father had ever repaid any money to his mother.  (*Id.* at p. 731.)  The court held it was not an abuse its discretion to consider the cash gifts as income to the father for purposes of child support because "the gifts bear a reasonable relationship to the traditional meaning of income as a recurrent monetary benefit."  (*Id.* at pp. 736-737.)  The court added, "But while regular gifts of cash may fairly represent income, that might not always be so.  Therefore, the question of

---

[9]     The parties do not challenge whether *Alter* was correctly decided, and we do not reach that question.  But as we observed in *Rubanowitz I*, *Alter* is "in some ways inconsistent with economic reality" because "the common understanding of the term 'income' does not usually include gifts, whether recurrent in nature or not."  (*Rubanowitz I, supra*, B257782.)

whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court." (*Id.* at p. 737.)

Substantial evidence supports the family court's finding that Moskovits's payments to Barbra and to third parties on her behalf were gifts that "were irregular in both amount and frequency of payment" and the varying amounts were "tied to [Barbra's] and the minor children's needs and expenses." Moskovits's spreadsheets, which were admitted at trial, show Moskovits made payments to Barbra, her attorneys, and other service providers in varying amounts from November 2011 to February 2019. Shalom's accounting expert Anfuso admitted Moskovits's monthly payments varied "based on the expense reports provided by [Barbra] to her father." On appeal, Shalom asserts Moskovits made regular monthly payments to Barbra, but he does not point to any specific payments or other evidence to support this contention. On this record, the family court did not abuse its discretion in determining Moskovits's payments were not income attributable to Barbra for purposes of child and spousal support. (See *County of San Diego v. P.B.* (2020) 55 Cal.App.5th 1058, 1073, 1076 [trial court did not abuse its discretion in ruling payments made by father's parents to his attorneys was not "recurring and regular monetary gifts that may be treated as income under section 4058"]; *Anna M., supra,* 7 Cal.App.5th at pp. 444, 454 [trial court did not abuse its discretion in concluding monthly payments by mother's friend to her or to third parties on her behalf were not income for child support where there was no familial relationship between mother and her friend and no evidence showing whether the cash gifts varied and for how long mother's friend had supported her]; *In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1314-1315

[trial court did not err in determining the recurring annual tax-free gifts to father from his parents were income, but not the cash advances that were irregular and had ceased].)

B.    *Shalom Forfeited His Challenge to the Family Court's Denial of a Trial Continuance*

Shalom contends he was prejudiced by the family court's denial of his request to continue the trial to allow him to call Miller, Barbra's vocational evaluator, because he was unable to show Barbra's ability to earn an income.  Shalom forfeited his claim of error because his attorney stipulated to the admission of Miller's vocational examination report in lieu of her trial testimony.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 ["'[W]hen a party enters into a voluntary stipulation, he generally is precluded from taking an appeal claiming defects in the stipulation.'"]; *People v. Gurule* (2002) 28 Cal.4th 557, 623 [same].)  Further, Anfuso relied on Miller's vocational examination report in imputing income to Barbra, explaining at trial that he had imputed $3,389 per month in income to Barbra based on "an average of three different job categories as opined by [Barbra's] vocational evaluator" which "were social service case work at approximately $40,000 a year, program coordinator at approximately [$]41,000 and licensed vocation nurse at [$]41,000."  Shalom cannot stipulate to the admission of Miller's report in lieu of her testimony, rely on the report at trial, then claim error only after the family court rules against him.

C.    *Shalom Forfeited His Challenge to the Family Court's Denial of His Request for Attorneys' Fees*

Sections 2030 and 2032 govern an award of attorneys' fees and costs in a dissolution action.  Under section 2030,

20

subdivision (a)(1), the family court "shall ensure" all parties have access to legal representation. The court may award attorneys' fees "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (§ 2030, subd. (a)(2); accord, *Ciprari, supra*, 32 Cal.App.5th at p. 112 ["an award of 'reasonably necessary' fees and costs" to a party is mandatory if the trial court find there is a disparity in access to funds to retain counsel and the other party can pay both parties' legal representation]; *In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1052-1053; *In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868 ["In deciding whether to award attorney fees, the trial court considers the parties' respective needs and incomes, including their assets and liabilities."].)

"The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).)

We review an order granting or denying attorneys' fees and costs for an abuse of discretion. (*In re Marriage of Bendetti,*

21

*supra*, 214 Cal.App.4th at p. 868 ["A motion for attorney fees is left to the trial court's sound discretion and will not be disturbed on appeal absent a clear showing of abuse."]; *In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662 [under §§ 2030 & 2032, "a trial court has wide discretion in fashioning an award of attorney fees in marital proceedings"]; *In re Marriage of Keech, supra*, 75 Cal.App.4th at p. 866.) ""'[T]he trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made.'"" (*Bendetti*, at pp. 868-869, quoting *In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 769; accord, *Keech*, at p. 866.) The party challenging the order on attorneys' fees has the burden of showing the family court abused its discretion. (*Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 644.)

On appeal, Shalom contends the family court abused its discretion in failing to consider the payments made by Moskovits to Barbra with respect to Shalom's request for attorneys' fees and costs. But in ruling on Shalom's request, the court acknowledged it could consider Moskovits's payments of Barbra's attorneys' and expert fees "in balancing the evidence in a request for attorney fees." (See *In re Marriage of Smith, supra*, 242 Cal.App.4th at p. 534 [trial court had discretion to consider payments made by wife's father to her attorneys "as part of its determination of the relative circumstances of the respective parties and their ability to maintain or defend the proceedings"]; *Kevin Q. v. Lauren W., supra*, 195 Cal.App.4th at p. 647 [trial court did not abuse its discretion in considering wife's receipt of regular, recurring monetary gifts from her father in determining her ability to pay her attorneys' fees].)

Instead, the family court denied Shalom's request for attorneys' fees and costs because Shalom "produced little, if any,

evidence to support his requests and demands." The court correctly found Shalom "provided no evidence regarding the basis or reasonableness of the legal fees requested" for Landau, Shuchman and Kaplan, and Horwitz because Shalom did not provide any attorney declarations or billing statements from these attorneys. As to Teitelbaum's four-page billing record for the period from March 2018 to March 2019, the court found the statement was "very summary in nature and does not describe the legal work done other than in bulk hour descriptions." On appeal, Shalom does not argue the family court abused its discretion in finding there was insufficient support for Shalom's request for attorneys' fees and costs. Nor does he point to evidence in the record to support his requests for payment of costs paid to Barbra in the prior appeal; payment for a judgment obtained by White Zuckerman; and $900,000 in sanctions against Barbra.[10]

Shalom therefore has forfeited his challenge to the family court's denial of his request for attorneys' fees and costs. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal argument and citation to authority on each point raised, "'the court may treat it as waived, and pass it without consideration.'""]; *Ko v. Maxim Healthcare Services, Inc.* (2020) 58 Cal.App.5th 1144, 1147, fn. 3 ["'Issues not raised in the appellant's opening brief are deemed waived or abandoned.'"].)

---

[10] Teitelbaum also included in his billing statement approximately $1,900 in court reporter fees and $17,000 for Anfuso's expert witness fees. No documentation was provided for any of these charges.

## DISPOSITION

The judgment is affirmed.  Barbra is entitled to recover her costs on appeal.

FEUER, J.

We concur:

PERLUSS, P. J.

SEGAL, J.